Larry L. DAVIS, Appellant,

v.

GIBSON PRODUCTS COMPANY, Appellee.

No. 15157.

Court of Civil Appeals of Texas, San Antonio.

Dec. 19, 1973.

Rehearing Denied Feb. 13, 1974.

Southers, Mendelsohn, Goldberg & Lyons, Inc., San Antonio, for appellant.

Clemens, Weiss, Spencer & Welmaker, George H. Spencer, San Antonio, for appellee.

CADENA, Justice.

Plaintiff, Larry L. Davis, individually and as next friend of his minor son, Larry Mark Davis (referred to in this opinion as "Mark"), appeals from a judgment, based on a jury verdict,[1] denying recovery against defendant, Gibson Products Co., d/b/a Gibson Discount Store, for injuries suffered by Mark while he was examining a machete which was on display at defendant's store.

According to the petition, Mark picked up the machete, which was encased in a cloth sheath, to examine it. While holding the sheathed machete in his left hand, he began to withdraw the machete from its sheath. As he did so, the blade cut through the bottom of the sheath, and Mark suffered lacerations on the third and fourth fingers of his left hand. Recovery was sought on the basis of "strict liability"

---

1. The jury found: Defendant negligently failed to inspect the machete and sheath (Issue No. 1), but such negligence was a proximate cause of the injury (Issue No. 2). Defendant did not place on display a " . . . machete inside of a sheath that was so thin that the blade would cut through the sheath when withdrawn at 4 pounds pressure by a customer." (Issue No. 3). One of defendant's employees " . . . warned . . . Mark . . . to stop playing with the machete in question . . . "; but Mark disregarded such warning; the disregard of such warning was negligence; and such negligence was a proximate cause of the injury (Issues Nos. 6, 7, 8 and 9). Mark withdrew the machete from the sheath in a "sudden" manner (Issue No. 10), but this did not constitute negligence. (Issue No. 11).

and on several alleged negligent acts on the part of defendant.

By way of twenty-seven points of error, plaintiff asserts that: (1) the trial court erred in failing to submit several special issues requested by plaintiff; (2) the trial court erred in overruling plaintiff's objection to some of the issues submitted; (3) there is no evidence, or in the alternative, insufficient evidence, to support the jury's answers to certain issues; and (4) the trial court erred in not granting plaintiff's motion for judgment non obstante veredicto.

Defendant's store is of the self-service type, and persons in the store are expected to handle and examine the goods on display and, if they decide to buy an item, to take their selection to a cash register station and pay for it. Defendant desires that people handle and examine the displayed merchandise if they want to buy it and also if they just want to look at it. No signs are displayed informing unescorted teenagers not to enter the store, nor are there any signs requesting those unescorted teenagers who are in the store to leave. A substantial portion of defendant's sales are made to teenagers.

Mark was thirteen years old at the time he was injured. Defendant's manager testified that it was anticipated that persons in the store, including boys thirteen years of age, would handle the machetes, which were on display on an open counter and within the reach of customers, to examine them and that, in the course of such examination the machetes would be withdrawn from their sheaths.

It is undisputed that, immediately prior to, and at the time of, the injury, Mark was in the store accompanied by three boys of about the same age as Mark. After Mark had purchased some gum and one of the other boys had bought some popcorn, the boys went to the sporting goods department. While they were in the vicinity of an archery display, Ralph Schoenfeld, the manager of the department, asked if he could help them and was told that they were ". . . just looking." According to Schoenfeld, one of the boys upset a box of arrows, and Schoenfeld ". . . remarked at the time it wasn't a playhouse and they should cut it out." Schoenfeld's testimony on this point was flatly contradicted by the boys, who denied that any one of them had upset a box of arrows and denied being told to "cut it out" or being told that the store was not a playhouse.

Schoenfeld testified that the boys then proceeded down the aisle to the machete display, where one of the boys picked up a machete. He was joined by two other boys, and ". . . they were all handling them, fooling around." Schoenfeld said that when one of the boys ". . . acted like he was going to fence," Schoenfeld told him, "That's about enough now. Why don't you just put them back and leave?" The boys left the area of the machete display but, according to Schoenfeld, they soon returned at a time when Schoenfeld was attending to some customers, so that, according to Schoenfeld, he was unable to talk to them again. While Schoenfeld was attending to the customers, Mark cut his hand. Schoenfeld did not see the incident.

Again, Schoenfeld's testimony was contradicted by the boys. They denied that they were "playing around with the machetes" and denied Schoenfeld's statement relating to the "fencing" incident. They denied that Schoenfeld, or any other employee, had talked to them and denied that any of defendant's employees had commanded, directed or suggested that they put the machetes back "and leave." There is no evidence indicating that, at the time he was injured, Mark was "fooling around" with the machetes or that he was using them in an improper manner.

Mark's testimony relating to the manner in which he cut himself is not a model of consistency, but it is sufficient to justify the conclusion that the injury occurred in the manner described in the petition.

The machete in question, and the sheath in which it was encased, were admitted into evidence. The operator of a testing laboratory testified that his test of the machete and sheath revealed that the blade of the machete was "sharp" and that it would cut through the sheath if withdrawn under 9 pounds' pressure, and that if it were withdrawn rapidly, the machete would cut through the sheath under 4 pounds' pressure. The jury found that Mark withdrew the machete from its sheath in a "sudden" manner.

The jury had an opportunity to examine the machete and witnessed the demonstration which showed that it was sharp enough to cut a sheet of paper. An examination of the sheath reveals that it consists of a single layer of cloth sewn together at the bottom by a single strand of thin thread. When the machete is withdrawn from its sheath, the sharp edge of the blade slides across the seam so formed. A simple examination of the sheath justifies describing it as flimsy.

It is undisputed that defendant did not inspect the machetes or the sheaths and subjected them to no tests. It is also undisputed that there were no signs or other warnings as to the existence of any danger to persons handling the machetes.

We point out, at the outset, that we disregard the contention in defendant's brief to the effect that, at the time he was injured, Mark's status was not that of a business invitee or business guest. When defendant attempted to introduce testimony as to Mark's purpose for being in the store, counsel for plaintiff objected on the ground that defendant was attempting to show that Mark was not a business invitee, and that such evidence was irrelevant since, as a matter of law, Mark was a business invitee. After the trial judge remarked that he did not think defendant was contesting that point, counsel for defendant stated, "No, I'm contesting what these boys were doing with this display." The court then stated that he did not think

". . . there's a question about the other point," and counsel for defendant replied, "No." Counsel for defendant then continued with his line of questioning.

■ We believe that defendant admitted, in open court, that Mark was a business invitee at the time he was injured, and that defendant cannot now take a position inconsistent with such admission. Cook v. Winter, 207 S.W.2d 145 (Tex.Civ. App.—Amarillo 1947, writ ref'd n. r. e.).

■ Plaintiff's second and fifth points complain of the court's failure to submit issues relating to defendant's negligence in failing to place the machetes out of the reach of customers annd in failing to place warning signs. No issue was submitted, and none was requested, inquiring whether the machetes, as displayed, created a risk of injury. The evidence does not establish the existence of a dangerous condition as a matter of law. It is clear that defendant's failure to place the machetes out of the reach of customers and his failure to post warnings would constitute negligence only if the display created danger of injury. Under the circumstances, the tendered issues were properly refused. Cf. Adam Dante Corporation v. Sharpe, 483 S.W.2d 452, 455 n. 1 (Tex.1972).

■ Plaintiff's third point complains of the court's failure to submit issues inquiring whether defendant had been causally negligent in placing on display a machete ". . . which was so sharp that it would cut through the sheath at 4 pounds pressure by a customer." There was no evidence to support the submission of this issue. The only evidence in the record relating to 4 pounds' pressure is to the effect that the machete would cut through the sheath if withdrawn *rapidly* under 4 pounds' pressure. Point No. 4, which complains of the refusal of the trial court to submit issues concerning defendant's negligence in placing on display a machete encased in a sheath so thin that

the blade would cut through the sheath when withdrawn at 4 pounds' pressure by a customer is without merit. This inquiry was actually submitted to the jury by Issue No. 3.

■ Point No. 6 concerns the court's failure to submit issues inquiring whether defendant was causally negligent in failing to submit the machetes and sheaths to tests. The requested issues relating to testing are but shades of the submitted issues concerning defendant's failure to inspect. Such issues were, therefore, properly refused. Rule 279, Texas Rules of Civil Procedure; Hodges on Special Issue Submission in Texas, Section 54, p. 136 (1959).

■ Point No. 7 complains of the submission of Special Issue No. 6, inquiring whether Mark was "warned" to stop playing with the machetes. Plaintiff insists that the issue was submitted in such a manner that it amounted to a comment on the weight of the evidence, since it assumed that Mark was under a duty not to play with the machetes. Plaintiff did not object to the submission of the issue on this ground. Point No. 7 cannot be considered.

Points Nos. 8–25, inclusive, contend that the court erred in submitting, over various objections filed by plaintiff, Special Issues Nos. 6, 7, 8 and 9, and also insist that there is insufficient evidence to support the jury's answers to those issues. In answer to these issues, the jury found that defendant's employee, Schoenfeld, had "warned" Mark to stop playing with the machetes (Issue No. 6); that Mark disregarded such "warning" (Issue No. 7); that such disregard of the "warning" by Mark constituted negligence (Issue No. 8) which was a proximate cause of "the occurrence in question" (Issue No. 9).

■ There is no evidence to the effect that Mark was "warned" to stop playing with the machetes (assuming that he was, in fact, "playing" with them) in the sense that he was made aware of the existence of danger. Since the machetes were enclosed in sheaths, it was not possible to ascertain the sharpness of the blades without withdrawing the knives. A command, direction or suggestion that one stop "playing" with something and "leave" cannot be interpreted as a "warning" of a dangerous condition. Unless Mark knew, or should have known, of the existing danger, his failure to obey Schoenfeld, while, perhaps, evidencing a rebellious nature and a lack of proper respect, cannot be classified as negligent conduct. There is, therefore, no evidence to support the findings of contributory negligence.

In view of our conclusions concerning the sufficiency of the evidence in connection with Issues Nos. 6–9, it is unnecessary to discuss further the questions raised by plaintiff's points Nos. 18–25.

Points Nos. 26 and 27 assert that plaintiff was entitled to judgment as a matter of law because the evidence established as a matter of law that defendant's failure to inspect was a proximate cause of Mark's injury. In answer to Special Issue No. 1, the jury found that defendant negligently failed to inspect the machete and sheath. However, in answer to Special Issue No. 2, the jury found that such negligence was not a proximate cause of the injury.

■ The problem of proximate cause has confused juries, judges, advocates, teachers and students for centuries. Green & Smith, Negligence Law, No-Fault, and Jury Trial—III, 51 Tex. Law Rev. 207, 220 et seq. (1973). About all that can be said is that, although the question of proximate cause ordinarily presents a factual issue to be resolved by the jury, in some cases it will be held, as a matter of law, that the negligence of the defendant is, or is not, a proximate cause of plaintiff's injuries. Clark v. Waggoner, 452 S.W.2d 437 (Tex. 1970).

■ A holding that proximate cause is established as a matter of law is possible only in those cases where, as in *Clark*, it is

undisputed that defendant's negligence was a cause in fact. 452 S.W.2d at 439, n. 1; cf. Green & Smith, op. cit. at 231. In the case before us, the jury clearly concluded that an ordinary prudent person displaying machetes for sale would have inspected the product, realizing that displaying such products in a dangerously defective condition creates an unreasonable risk of injury. It is this foreseeability, and not the existence of the dangerous condition which a reasonable inspection might uncover, which renders the failure to inspect negligent. If an inspection would not reveal the existence of a dangerous condition, the failure to inspect cannot be said to be the cause of a risk of injury. Here, no issue relating to the existence of a dangerous condition was submitted, and none was tendered by plaintiff. The evidence does not establish the existence of a dangerous condition as a matter of law. The jury would be justified in concluding that no dangerous condition existed in fact. In such case, the finding that the negligent failure to inspect was not a proximate cause of the injury would be a reasonable conclusion.

It cannot be said that the required causal connection between defendant's negligent failure to inspect and plaintiff's injury was established as a matter of law.

There remains for consideration only plaintiff's complaint, embodied in his first point, of the refusal of the trial court to submit issues relating to plaintiff's claim under the doctrine of strict liability. The requested issues and the requested explanatory instructions, are substantially in the form described in McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.1967), and C. A. Hoover & Son v. O. M. Franklin Serum Co., 444 S.W.2d 596 (Tex.1969). Such requested issues and instructions incorporate the elements of the doctrine of strict liability as enunciated in Restatement (2d), Torts, Section 402A (1966).

■ The doctrine of strict liability as set out in the Restatement was approved by our Supreme Court in *McKisson* and, again, in Darryl v. Ford Motor Co., 440 S.W.2d 630 (1969). This formulation of the doctrine imposes strict liability on "one who sells" a product in a defective condition unreasonably dangerous to the "user" or "consumer" for harm caused to the "ultimate user or consumer" if the "seller" is engaged in the business of "selling" such a product and the product is expected to, and does, reach the "user or consumer" without substantial change in the condition in which it is "sold."

Defendant asserts that the tendered issues were properly refused because such issues ". . . assumed the machete was transferred . . ." by defendant to Mark ". . . as user or consumer within the meaning of the rule of strict liability, and this was a disputed fact issue . . . ." Defendant further defends the trial court's refusal to submit the tendered issues by pointing out that there was no "sale" of the product by defendant.

Before discussing the question of the applicability of the doctrine of strict liability, it should be pointed out that the evidence establishes that one of the purposes of encasing the machetes in sheaths is to protect the hands of persons examining the machetes.

Although the Restatement's formulation speaks in terms of liability of the "seller" of chattels to "users and consumers," it is clear that the protection of the doctrine is not limited to users and consumers of the defective product. The framers of the Restatement, by way of caveat appended to Section 402A, made it clear that no opinion was expressed on whether the rules embodied in that section ". . . may not apply (1) to harm to persons other than users or consumers . . . ." Comment o. to Section 402A admits that there may be no reason for denying the protection of the doctrine to nonusers and nonconsumers ". . . other than that they do not have the same reasons for expecting such protection as the consumer who buys . . . ." the product, since the develop-

ment of the doctrine of strict liability was a response to "consumers' pressure."

The Restatement's "consumer expectation" rationale for denying recovery to nonusers and nonconsumers has not won judicial acceptance. Apparently with only one exception,[2] the courts which have considered the problem have not limited its application to users and consumers. Comment, 10 Houston Law Rev. 1106, 1115 (1973). Perhaps the most influential case allowing nonusers and nonconsumers to recover is Elmore v. American Motors Corp., 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84 (1969), where, in the course of holding that a casual bystander is protected by the doctrine, the Supreme Court of California pointed out that injury to a bystander is often foreseeable and that restriction of the doctrine to users and consumers rests on what is but a vestige of the disappearing privity requirement often applied, and frequently mutilated, in cases where a supplier of chattels was held liable on some theory of "warranty." 75 Cal.Rptr. at 657, 451 P.2d at 89.

In *Darryl,* Texas rejected the limitation on the doctrine suggested in the caveat to Section 402A, saying: "There is no adequate rationale or theoretical explanation why non-users and non-consumers should be denied recovery against the manufacturer of a defective product." 440 S. W.2d at 633. The statement concerning the absence of an "adequate" rationale for limiting recovery to users and consumers is significant because it was made after the Supreme Court had referred to the Restatement's caveat. Clearly, the "consumer-expectation" rationale was regarded as not "adequate," and the Court rejected privity-oriented notions as persuasive grounds for limiting the application of the doctrine.

The trial court's refusal to submit the requested issues cannot be supported on the ground that Mark was not a user or consumer of the product.

Defendant concedes that, despite the use in Section 402A of such terms as "one who sells," "seller," "sells" and "sold," the rule of strict liability is applicable even though there has been no "sale" of the product by defendant in the sense of a transfer of title for a consideration. Thus, in *McKisson,* the product had not been sold by defendant, but had merely been furnished to plaintiff as an advertising sample. In Delaney v. Towmotor Corp., 339 F.2d 4 (2d Cir. 1964), the defendant was held strictly liable, although he had merely delivered a piece of equipment to be used by a prospective customer so that the prospective customer might become acquainted with defendant's new models. Lessors of chattels have been held strictly liable. Hursh, American Law of Products Liability, Section 5A:21, pp. 410–11 (1973 Supp.).[3]

While recognizing that proof of a "sale" in the strict legal sense of that term is not essential, defendant insists that the supplier of a chattel is strictly liable only when he has transferred possession of the chattel by sale, lease or similar commercial transaction. Such a view is consistent with the result reached in cases like *McKisson,* where there was unquestionably a transfer of possession and, probably, of title, since the facts indicate a gift of the product. Defendant's theory is also consistent with the bailment cases, such as *Towmotor,* and with the cases holding lessors of chattels strictly liable, since both bailments and leases involve a transfer of possession.

It is true that in most cases where the doctrine has been applied the facts have

---

2. Davidson v. Leadingham, 294 F.Supp. 155 (E.D.Ky.1968), appears to be the only decision purporting to apply the law of a state which has adopted strict liability which has limited recovery to users and consumers.

3. A federal district court refused to extend the doctrine to include lessors on the ground that the doctrine, by its terms, is applicable only to "sellers." Speyer, Inc. v. Humble Oil & Refining Co., 275 F.Supp. 861 (W.D.Pa. 1967).

shown a sale, bailment, lease or, as in *Mc-Kisson*, a gift of the product for advertising purposes by defendant, and that, in such cases, there has been a transfer of possession of the product by defendant. But we have found no case which makes liability dependent on a transfer of possession by defendant.

The two cases involving facts most clearly similar to those in the case before us were both decided by the highest tribunal of the state of Kentucky. In both Rogers v. Karem, 405 S.W.2d 741 (Ky.1966), and Kroger Co. v. Bowman, 411 S.W.2d 339 (Ky.1967), it was held that the operator of a self-service grocery store was strictly liable to a person injured when, as she was lifting a carton of soft drinks from a shelf, the bottles fell to the floor due to the defective condition of the carton.

The fact that, as defendant points out, both *Rogers* and *Kroger* were decided in the trial court before Kentucky adopted the rule stated in Section 402A, is irrelevant. Both decisions are based on the doctrine of strict liability, and both opinions refer to Dealers Transport Co. v. Battery Distributing Co., 402 S.W.2d 441 (Ky.1966), in which the doctrine as set out in Section 402A was approved.

Defendant argues that in each of the Kentucky cases there had been sale of the product to the plaintiff, " . . . who accepted delivery . . . " of the product " . . . as offered by the seller." It is clear that in neither case had there been a "sale" of the product in the sense that there had been a transfer of title, and it cannot be persuasively argued that, in either case, plaintiff and the retailer had entered into a contract of sale. Nor do the facts of *Rogers* and *Kroger* suggest that there had been a transfer of possession such as that involved in the bailment or lease of a chattel. If, in fact, the plaintiff in each of the two cases had possession of the carton of soft drinks, it was a unique sort of possession. No definition of "possession" has been suggested which would justify the conclusion that a person who picks up a product from a shelf in a self-service establishment acquires, by such act, possession of the product or "has accepted delivery of" the product "as offered by the seller." In any event, if plaintiffs in *Rogers* and *Kroger* had acquired possession of the cartons, it must be concluded that, unless we are prepared to rely on distinctions too abstruse to be understood, Mark had the same kind of possession here.

Since, as defendant points out, neither the *Rogers* nor the *Kroger* opinion discusses the question of whether there had been a "sale," in the sense of a transfer or delivery of possession of the product by defendant, it is necessary to consider the basis for the liability imposed by Section 402A, in order to determine the classes of persons upon whom liability is imposed and the classes of persons protected.

Apparently, the public policy consideration now most widely accepted by the courts as the primary justification for strict products liability is loss spreading. Keeton, Products Liability—Some Observations About Allocation of Risks, 64 Mich.Law Rev. 1329, 1333 (1966). This principle was mentioned in Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 81 (1960), and was adopted in the leading case in the area. Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901 (1962). In *Darryl*, our Supreme Court emphasized the " . . . desire to minimize risks of personal injury . . . ." 440 S.W.2d at 633. Neither of these rationales suggest that liability should be limited to cases involving a transfer of possession.

While the statement of the doctrine speaks of the liability of a "seller," it is clear that the term designates a class and is not a designation of limitation. Stang v. Hertz Corp., 83 N.M. 730, 497 P.2d 732 (N.M.Sup.1972); Lechuga, Inc. v. Montgomery, 12 Ariz.App. 32, 467 P.2d 256

(1970). Our Supreme Court adopted this view in *Darryl,* when it spoke of the liability of one ". . . who places in commerce . . ." a product dangerous because of some defect. 440 S.W.2d at 633. The stream of commerce includes the manufacture of the object and its distribution, including the activities of retailers. Unless it be argued that goods displayed for sale by a retailer are not in the stream of commerce, it is clear that continuation of the flow of commerce does not require transfers of possession.

Concerning the class of persons protected by the doctrine, Chief Justice Traynor in *Yuba* spoke of liability when the defective product causes injury not merely to a user or consumer, but ". . . to a human being." 27 Cal.Rptr. at 700, 377 P.2d at 900.

The liability created by the doctrine of strict liability rests on foreseeability, and not on esoteric concepts relating to transfer or delivery of possession. Piercefield v. Remington Arms Co., 375 Mich. 85, 133 N.W.2d 129 (1965). As one recognized authority has pointed out, the effect of extending the protection of the doctrine to casual bystanders, as was done in *Darryl,* ". . . is obviously to put strict liability on the same footing as negligence." Prosser, Torts, Section 100, p. 663 (4th Ed. 1971). The element of foreseeability has been stressed in cases allowing recovery by bystanders. In addition to the opinion of the Supreme Court of California in *Elmore,* 75 Cal.Rptr. at 657, 451 P.2d at 89, the foreseeability of injury to plaintiff was relied on by the Florida court in Toombs v. Fort Pierce Gas Co., 208 So.2d 615 (Fla.Sup.1968). In Caruth v. Mariani, 11 Ariz.App. 188, 463 P.2d 83 (1970), the court merely paraphrased the reasoning of the California court in *Elmore.*

In this case, injury to a person in Mark's position was clearly foreseeable by defendant. It is undisputed that defendant foresaw that persons in the store, including persons of Mark's age, would handle the machetes and, in the process of examining them, would remove the machete from the sheath in order to examine the blade. Even without such testimony, the operator of a self-service establishment can certainly foresee that persons in his store will handle and examine the products displayed for sale.

We conclude that *Rogers* and *Kroger* were correctly decided by the Kentucky court, and that the term "user or consumer" as interpreted by the courts, particularly in the bystander cases, is broad enough to bring Mark within the protection of the doctrine.

To impose liability of defendant here is not to make it an insurer. The scope of responsibility under Section 402A is limited by the "intended use" doctrine, which requires consideration of the defendant's marketing scheme and the foreseeability of harm. Defendant's marketing procedure contemplated, and, perhaps, made it inevitable, that persons in its store would handle and examine the items on display. The injury here was to a person who belongs to the class of persons who, because of defendant's marketing procedures, could be expected to use the machete and sheath. Mark, at the time of his injury, was using the product in at least one of the manners for which it was intended and exactly in the manner that defendant intended that he would use it. Cf. Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841, 859 (5th Cir. 1968). Defendant's display of the product was essentially commercial in character, since it displayed the goods with the expectation of profiting from future sales. Cf. *McKisson,* 416 S.W.2d at 792.

Defendant points out that, at the time of his injury, Mark had no present intention of buying the machete. However, Mark testified that, while he had no use for a machete, if he saw one he liked he might return later and buy it. He testified that, on prior occasions, he had gone into stores just to "look around," and, after seeing some-

thing that appealed to him, he had returned to the store later to purchase it. Defendant's manager testified that a substantial portion of the store's sales were "delayed" sales. That is, it is not uncommon for a person to walk into a store with no present intention of making a purchase, leave the store, and return later to purchase an item which caught his fancy on the first trip. There is sufficient evidence to support the conclusion that Mark was a prospective purchaser or potential customer and a member of the class of persons whom retailers welcome into their stores with the expectation that the "just looking" visit will result, then or at a later date, in a purchase of an item on display.

■ Although its brief contains no separate counter-point embodying such a contention, defendant does assert that the strict liability issues were properly refused because there is no evidence which would support a finding that the sheath in which the machete was encased was defective in the sense that it created an unreasonable risk of injury when put to its intended use. We have already reviewed the evidence concerning the sharpness and the thinness of the sheath. While we concluded that the evidence was insufficient to establish the existence of a dangerous condition as a matter of law, it is sufficient to support the conclusion that, considering the sharpness of the blade, the sheath was improperly designed and that, because of such defective design, it was unreasonably dangerous when put to one of its intended uses.

There is nothing in the record to suggest that Mark assumed the risk. Since the machetes were encased in sheaths, it was impossible to discover the sharpness of the blades without withdrawing the machetes from the sheaths.[4]

We conclude that the pleadings and the evidence were sufficient to entitle plaintiff to a submission of the issues relating to strict liability.

The judgment of the trial court is reversed and the cause is remanded for a new trial.

BARROW, C. J., concurs in result.

---

4. Since the machetes were encased in sheaths, the danger, which resulted from a combination of the sharpness of the blades and the design of the sheaths, was a hidden danger. It would be difficult, if not impossible, to rely on the doctrine of strict liability if the sharp machetes had been put on display without the sheaths. Sharp knives and other sharp instruments are, of course, dangerous. Such instruments, if they are to be fit for their intended use, must be, to some degree, at least, dangerous. But, assuming proper use, the risk of injury is relatively slight, particularly when consideration is given to the social utility of the product. But if a sharp instrument is encased in a sheath, scabbard, or other protective covering, the situation is quite different, at least with respect to the protective covering. Such protective devices can serve their intended purposes without being dangerous, and the danger created by a defect in the covering or its design serves no useful social purpose, and the protective device can serve its intended purpose without being dangerous.