**ARMSTRONG RUBBER COMPANY, Appellant,**

v.

**Conrada URQUIDEZ et al., Appellees.**

**No. 6616.**

Court of Civil Appeals of Texas, El Paso.

Dec. 30, 1977.

Rehearing Denied Jan. 25, 1978.

Rassman, Gunter & Boldrick, John E. Gunter, Midland, for appellant.

Kenneth A. Perez, Dallas, for intervenor.

Warren Burnett, Associated, W. Ruff Ahders, Richard J. Clarkson, Odessa, for appellees.

## OPINION

WARD, Justice.

This is a products liability action where a tire alleged to be defective in design and manufacture sustained a blowout and caused a truck to overturn and kill the driver. Trial was to a jury which determined that the tire was defective in its design or manufacture and that the defect was a producing cause of the accident. Based upon all issues submitted, judgment was entered awarding the Plaintiff/widow $75,000.00, the Plaintiff/son $12,000.00, and with the awards being subject to the intervening workmen's compensation carrier's subrogation rights. The question of interest on this appeal concerns the application of the doctrine of strict liability where there had been no sale of the product by the manufacturer but a bailment of the tire for mutual benefit. We affirm.

Automotive Proving Grounds, Inc., owns and operates a tire testing facility near Pecos. It contains a test track consisting of a 9-mile oval with asphalt surface, and also a serpentine route through the center area of the track. On January 1, 1970, a 10-year contract was entered into between Automotive Proving Grounds, Inc., and the Defendant, Armstrong Rubber Company, whereby

the testing facilities and grounds were made available to the Defendant on a part-time basis. The material parts of the agreement were as follows:

"1.3 Automotive will maintain the track and Automotive's buildings and improvements erected on or contiguous thereto * * *."

"1.4 Automotive will provide competent drivers and other employees as are necessary for Armstrong's test purposes."

"4.1 Armstrong will own or lease and maintain all trucks and vehicles required for Armstrong testing."

"4.4 Armstrong agrees to abide by all general rules and regulations promulgated by Automotive relating to track scheduling, track usage, safety, vehicle safety, insurance protection, and any and all other rules and regulations promulgated for the proper administration or maintenance of the track."

"5.1 Automotive will promulgate rules and * * * regulations relating to the number of vehicles and the speed and safety standards for such vehicles as well as all driver qualifications."

"5.3 Automotive shall hire, pay, account for and supply all drivers and mechanics and other personnel necessary for the testing to be conducted on the track. Automotive shall be the final authority on the retention of any such employee."

Armstrong owned 10 trucks and 40 cars that were located at the test track facility. Automotive Proving Grounds, Inc., had some 150 employees, some of whom performed all of the maintenance on the Armstrong vehicles, and some of whom did all of the driving at the test track.

The deceased, Clemente Urquidez, was employed by Automotive Proving Grounds, Inc., as a test driver. On April 13, 1972, he was driving an Armstrong truck/tractor and was pulling a Fruehauf trailer. He was performing a standard test on the oval track and was driving 60 miles an hour when the left front tire on the tractor blew out. After the blowout, Urquidez slowed down the truck and had arched into the left inside ground area of the oval track when he hit soft sand, overturned, and was killed. The tire that blew out was an Allstate Express Cargo Nylon 12-ply non-interest spare and was manufactured by the Defendant. The two front tires on the truck he was driving · were both non-interest spares. A "non-interest spare" is a term used for tires that are mounted on the test truck along with the tires being tested, but which are not themselves being tested. The tire in question had never been sold by Armstrong; it had been utilized only at the tire test track and on Armstrong's own trucks. The tire itself had never been tested and was new when received at the Pecos facility. At the time of the accident, about 50% of the tread on the tire had been worn down. Armstrong representatives testified that the tire was of the same quality as tires manufactured by Armstrong and sold to trucking fleets across the nation.

The Plaintiff's expert witness testified that the tire was defective, both in its design and manufacture, while the Armstrong experts all testified that such was not the case but that the blowout resulted from a bruise or impact injury to the tire which could have happened at anytime during its use, that is, that it was a road hazard injury and not a manufacturing defect that caused the blowout.

The case was submitted to the jury on four special issues. The jury, in the first, determined that the tire was defective in its design or manufacture; in the second, that the defective design or manufacture was a producing cause of the accident; in the third, that $75,000.00 would reasonably compensate Conrada Urquidez, the widow for her pecuniary loss resulting from the death of her husband; and, in the fourth, that $12,000.00 would reasonably compensate Clemente Urquidez, Jr., the son, for the pecuniary loss resulting from the death of his father. No defensive issue was requested or submitted to the jury.

■ By a series of points, Armstrong first raises the fundamental issue as to whether or not the doctrine of strict liability should apply to this product which has

never been sold, and which caused harm to a person who was not a consumer in the usual sense. The subject is ably briefed in the Houston Law Review article on "The Law of Strict Tort Liability in Texas," Vol. 14 (1976–77), beginning at page 93, where prospective defendants are discussed, and at page 126, where prospective plaintiffs are discussed. There, it is pointed out that the language of Section 402A, 2 Restatement of Torts 2d, imposes liability on sellers of defective products that are unreasonably dangerous and which cause damage to a user or to a consumer, and that the sellers must be engaged in the regular business of selling products. However, as further pointed out, the meaning of "sellers" has undergone a substantial amount of metamorphosis, "sellers" having been extended in some cases to include sellers of used products, bailors, lessors, and homebuilders. (Page 125).

Thus, in *Rourke v. Garza*, 530 S.W.2d 794 (Tex.1975), the sales requirement was easily brushed aside where only a lease of equipment was involved, the Court seeing no basis for distinction between a sale and lease of the product so long as one is engaged in the business of introducing products into the channels of commerce.

No sale occurred in *Shoppers World v. Villarreal*, 518 S.W.2d 913 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n. r. e.). There, the potential customer recovered when she placed the unreasonably dangerous product in her shopping cart and was injured before checking out of the store. Again, the doctrine of strict liability was extended even to the mere "lookyloo" in *Davis v. Gibson Products Company*, 505 S.W.2d 682 (Tex.Civ.App.—San Antonio 1973, writ ref'd n. r. e.). There, the Court stated that "strict liability rests on foreseeability, and not on esoteric concepts relating to transfer or delivery of possession." That foreseeability argument has sometimes been advanced to extend the protection of the doctrine to the bystander who was neither user nor consumer. However, it is to be noted that in Texas the principal basis for giving the bystander the protection of strict liability seems to be that of minimizing risk of personal injury and/or property

damage. *Darryl v. Ford Motor Company*, 440 S.W.2d 630 (Tex.1969).

Here, the manufacturer under the bailment furnished the tire on the front wheel of the truck which was to be used by the driver while driving at high speeds testing the tires on the rear of the truck. The tire was one regularly sold by the manufacturer in regular channels of commerce. Either because the manufacturer could reasonably foresee injury to this driver, or because of the policy consideration of loss spreading, or because of the desire to minimize risk of personal injury, the doctrine should be extended to this test driver for any alleged manufacturing or design defect occurring to this non-test tire. The deceased was not there to test the non-test tire. The Defendant's first six points of error are overruled.

■ By its next point, the Defendant questions the factual sufficiency of the evidence supporting the jury finding that the defective tire was a producing cause of the accident. The Defendant now takes the position that the soft sand encountered was the sole cause of the accident where it neither requested nor received an instruction on that question in the charge to the jury. Regardless of that, we have considered all of the evidence and that complaint is overruled.

■ By its last point, the Defendant complains of the jury award made to the son of the deceased. If the point be one complaining of no evidence to sustain the finding, we have reviewed the evidence and the inferences arising therefrom which support the jury finding and overrule the point. If the point be one suggesting a remittitur, then we cannot consider it as the only reference to the issue contained in the motion for new trial in the trial Court is one asserting that there was no evidence to support the finding and that the finding was against the great weight and preponderance of the evidence as to be manifestly unjust. Such language in a motion for new trial does not invoke remittitur power of the Court of Civil Appeals. *Collins v. Smith*, 142 Tex. 36, 175 S.W.2d 407 (1943);

*Bill Hendrix Auto Parts v. Blackburn,* 433 S.W.2d 237 (Tex.Civ.App.—Houston [14th Dist.] 1968, no writ). The point is overruled.

The judgment of the trial Court is affirmed.