[L. A. No. 29594. In Bank. Mar. 11, 1969.]

SANDRA LEE ELMORE, Plaintiff and Appellant, v. AMERICAN MOTORS CORPORATION et al., Defendants and Respondents.

[L. A. No. 29595. In Bank. Mar. 11, 1969.]

ANNA MAY WATERS, Plaintiff and Appellant, v. AMERICAN MOTORS CORPORATION et al., Defendants and Respondents.

(Consolidated Cases.)

James H. Davis and Edward L. Lascher for Plaintiffs and Appellants.

Booth, Mirchel, Strange & Willian, George C. Mitchel, Sweeney, Cozy & Foye, Thomas P. Foye and Raymond A. Cozy for Defendants and Respondents.

Morgan, Wenzel, Lynberg, Stearns & Morris and Wm. Marshall Morgan as Amici Curiae on behalf of Defendants and Respondents.

PETERS, J.—In these consolidated personal injury and wrongful death actions growing out of an automobile collision, the trial court at the conclusion of the plaintiffs' cases in chief granted motions for nonsuit by defendants American Motors Corporation and Mission Rambler Company and dismissed the jury. Plaintiffs have appealed from the ensuing judgments.

On March 16, 1962, plaintiff Mrs. Sandra Elmore and her husband purchased a 1962 Rambler American station wagon from Mission. The car had a standard transmission. It was not equipped with power steering or power brakes. Mrs. Elmore used the car to commute to work. The car was serviced by Mission after it had been driven about 1,500 miles. The car was lubricated and the oil and oil filter changed. Subsequently, Mrs. Elmore noticed that the car was shimmying when she drove it between 60 and 65 miles per hour.

She told her husband about the shimmying and asked him to drive the car. He could barely detect the shimmying and did not think it was sufficiently serious to warrant Mrs. Elmore taking time from her work to return the car for servicing. The Rambler had been driven 2,751 miles before the accident.

The accident occurred shortly after noon on April 29, 1962, a bright clear day. Mrs. Elmore was driving in a southerly direction on a three-lane road near Northridge. She suffered head injuries and was unable to remember anything about the day of the accident.

Mr. Hendley testified that he was following the Rambler for about a mile and a half before the collision, that Mrs. Elmore was travelling about 45 miles per hour, that she had caught up with the traffic in front of her and had started to pull out as if to overtake the vehicle in front of her, that a car honked to pass her, and that as she returned to the right hand lane, there was a series of ''sparks underneath the car like something fell. . . . like something in front was dragging. . . . like a big hunk of metal suddenly hitting the ground.'' Hendley stated that the sparks were ''strong'' ones, not like the little spark from a dragging chain. He also said that Mrs. Elmore started ''fishtailing,'' that as the ''fishtailing'' got worse the automobile went over to the wrong side of the road and struck the vehicle of plaintiff Waters, that the ''fishtailing'' continued until the collision, and that the impact hurled Mrs. Elmore from her vehicle onto the embankment.

A highway patrol officer investigating the accident shortly after the collision found skid and gouge marks on the pavement on the northbound lane. A gouge mark about 300 feet from the point of impact extended for a distance of some feet, although the precise distance from the gouge mark was not stated. Skid marks continued in a northerly direction from the gouge mark for about 164 feet. The same officer had patrolled the area about an hour before the accident and did not observe any skid or gouge marks at that time.

Mr. Snyder, a mechanical engineer and automobile expert, gave his opinion as to the cause of the gouge marks: ''Well, a piece of metal of some kind from the subject vehicle came against the roadway and scraped against it or gouged into it hard enough to abrade, gouged the roadway, as shown, in that during that process of gouging the roadway in that manner the metal would act the same as if you had put it against a rather large grindstone and sparks would be thrown off from the gouging of the metal against the roadway. It is an abrasive reaction between the metal and the roadway. Now, that would continue as long as the piece were rammed or jammed into the roadway. . . . [A] piece of metal which is gouging into the pavement is gouging by virtue of the fact that some portion is jamming it into it. Now, if it wears a little bit . . .

the vehicle passes over that, and then from then on it may just drag lightly, but it won't leave a gouge mark if it is just dragging along. It gouged hard, was forced into the pavement up to the end of the mark, then the mechanics of the situation is that the pressure was relieved at that point by one way or another and there is no further gouge mark.'' He did not examine the Rambler and could not tell which particular part had dropped from it although he mentioned a number of parts which could drop. He further testified that whatever piece of equipment may have come loose was in the forward part of the car.

Mr. Ausburn, a licensed engineer, examined the Waters and Elmore vehicles at a wrecking yard apparently eight days after the accident. He made a general examination of the car. At the time he did not have the benefit of the officer's report of the accident or of Mr. Hendley's statement, and he was not looking for a metallic object that might have dragged on the ground. The front end of the Rambler was badly damaged. The right front wheel was bent and the tire was flat. The intermediate rod was torn loose from the idler arm. Many of the parts associated with the steering mechanism were bent and displaced. After the steering mechanism was removed from the Rambler, Ausburn examined the steering box and found in it small metallic particles and particles of a piece of plastic impregnated tape which was similar to the plastic tape labelling the worm shaft of the steering gear.

When Ausburn examined the Rambler, the drive shaft, a metal tube about 3 inches in diameter, was not attached in its proper place but was in the rear of the Rambler station wagon. The drive shaft was buckled. When shown a photograph taken by the highway patrol officer a few moments after the accident, he stated that an object on the ground about 25 feet from the vehicle was ''probably'' the drive shaft from the vehicle.

Ausburn also testified that the drive shaft is attached at the forward and rear portions of the car to universal joints; that if a drive shaft fell down while the car was moving, it would dig into the roadway, make sparks, and cause the rear of the car to lift and to swerve or be thrown around; that normal wear and tear or ''anything the driver did'' would not cause a drive shaft to fall down in a space of 2,700 miles; that the cause of a drive shaft falling would be either loose fastenings or a metal failure; and that a drive shaft would not ordinarily be expected to become separated from the car in the accident which occurred.

In response to a hypothetical question assuming that there was heavy sparking underneath the Rambler and that immediately thereafter the Rambler went out of control and crossed to the other side of the highway, Ausburn gave his opinion that the cause of the sparking was "an undetermined part dropping down and dragging on the highway."

Ausburn further testified that an experiment he performed with the gear box indicated that the driver of the car would have to exert extra effort in steering the car to overcome the resistance caused by the presence of the tape in the gearbox.

Ausburn also said that his first examination of the Rambler did not disclose evidence of the existence of mechanical defects prior to the accident. After he examined the gearbox, he concluded that there was a defect before the accident in that a foreign matter apparently was present within the gearbox. At the time of trial, after he had seen the pictures of the scene of the accident and learned of the testimony of the heavy sparking, he was of the opinion that there was a second defect prior to the accident, namely, the disconnected drive shaft.

■ A nonsuit in a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor. (*Estate of Callahan,* 67 Cal.2d 609, 612 [63 Cal.Rptr. 277, 432 P.2d 965] ; *Taylor* v. *Centennial Bowl, Inc.,* 65 Cal.2d 114, 120-121 [52 Cal.Rptr. 561, 416 P.2d 793] ; *Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768].)

■ "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049] ; *Vandermark* v. *Ford Motor Co.,* 61 Cal.2d 256, 260-261 [37 Cal.Rptr. 896, 391 P.2d 168].)

■ Similarly, a retailer engaged in the business of distributing automobiles to the public is strictly liable in tort for personal injuries caused by defects in cars sold by it. (*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 263.) ■ In the last-cited case, it was recognized that a plaintiff is entitled to establish the existence of the defect and the defendants' responsibility for it by circumstantial evidence. (61 Cal.2d at

p. 260.) No reason appears why the same rule should not apply where the plaintiff is seeking to prove that the defect caused his injuries.

When the evidence is viewed, as it must be, most strongly in favor of plaintiffs, it furnishes an inference that their injuries were proximately caused by a defect in the Rambler which existed at the time of sale. Ausburn testified that in his opinion the car was defective prior to the accident in that the drive shaft was disconnected, and in the light of his further testimony as to what occurs when the drive shaft becomes disconnected, the presence of the gouge mark, and Mr. Hendley's testimony as to the sparks and the motions of the car prior to the accident, it could properly be inferred that the disconnected drive shaft gouged the roadway and caused the rear of the car to lift and to swerve or be thrown around which in turn caused the Rambler to go to the wrong side of the road. Thus, it could properly be found that the disconnected drive shaft was a proximate cause of the accident.

Ausburn also testified that the cause of a drive shaft falling would be either loose fastenings or metal failure and would not be ''anything the driver did'' or normal wear and tear. The car had been driven less than 2,800 miles, and so far as appears, the only servicing of the car, which was by Mission, did not involve replacement of the drive shaft or its connecting parts or any repairs to them. In these circumstances, it is not unreasonable to conclude that the defect in the metal or in the fastenings existed at the time of sale.

Since the plaintiffs thus produced evidence as to the defect which caused the injury and evidence permitting an inference that the defect existed at time of sale, *Jakubowski* v. *Minnesota Min. & Mfg.*, 42 N.J. 177 [199 A.2d 826, 829-830], relied upon by defendants, is distinguishable. The court there pointed out that its rule that the plaintiff must negate all possible causes for which the defendant was not liable applied in the absence of evidence ''which would permit an inference that a dangerous condition existed prior to sale.'' In that case an abrasive disc broke when used in a normal manner by plaintiff. The disc had been previously used by an employee whom plaintiff had replaced, and the court held that it was as probable that the breaking of the disc was due to a manufacturing flaw as that it was due to mishandling by prior users. In the instant case, there is no evidence that anyone handled the drive shaft after the sale of the Rambler, and the evidence

furnishes an inference that a dangerous condition existed prior to sale.

The authors of the Restatement have refrained from expressing a view as to whether the doctrine of strict liability of the manufacturer and retailer for defects is applicable to third parties who are bystanders and who are not purchasers or users of the defective chattel. (Rest.2d Torts. § 402A, com. o.) The authors pointed out that as yet (1965) no case had applied strict liability to a person who was not a user or consumer. Two recent cases, however, have held manufacturers of defective goods strictly liable in tort for injuries caused to persons who were mere bystanders and were not users or consumers. (*Piercefield* v. *Remington Arms Co.*, 375 Mich. 85 [133 N.W.2d 129, 134-136]; *Mitchell* v. *Miller,* 26 Conn. Supp. 142 [214 A.2d 694, 697-699].) There are also several cases which have permitted recovery in strict liability by persons who were not purchasers or users, although possibly they should not be categorized as bystanders. (*Connolly* v. *Hagi,* 24 Conn. Supp. 198 [188 A.2d 884, 887-888]; *Toombs* v. *Fort Pierce Gas Co.* (Fla.) 208 So.2d 615, 617; *Ford Motor Co.* v. *Cockrell* (Miss.) 211 So.2d 833, 834; *Lonzrick* v. *Republic Steel Corp.,* 6 Ohio St.2d 227 [218 N.E.2d 185. 188 et seq.]; *Webb* v. *Zern,* 422 Pa. 424 [220 A.2d 853, 854].) Several cases, most of them earlier, have refused to extend the doctrine in favor of the bystander. (See Prosser, *The Fall of the Citadel,* 50 Minn.L.Rev. 791, 820, fn. 154.) In *Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, one of the plaintiffs was a passenger in the car, but we did not discuss the issue of liability to her separately from the issue of liability to the owner-driver.

In *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal. 2d 57, 63, we pointed out that the purpose of strict liability upon the manufacturer in tort is to insure that "the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." We further pointed out that the rejection of the view that such liability was governed by contract warranties rather than tort rules was shown by cases which had recognized that the liability is not assumed by agreement but imposed by law and which had refused to permit the manufacturer to define its own responsibility for defective products. (59 Cal.2d at p. 63.) Similarly, in *Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 263, we held that, since the

retailer is strictly liable in tort, the fact that it restricted its contractual liability was immaterial.

■ These cases make it clear that the doctrine of strict liability may not be restricted on a theory of privity of contract. Since the doctrine applies even where the manufacturer has attempted to limit liability, they further make it clear that the doctrine may not be limited on the theory that no representation of safety is made to the bystander.

The liability has been based upon the existence of a defective product which caused injury to a human being, and in both *Greenman* and *Vandermark* we did not limit the rules stated to consumers and users but instead used language applicable to human beings generally.

It has been pointed out that an injury to a bystander ''is often a perfectly foreseeable risk of the maker's enterprise, and the considerations for imposing such risks on the maker without regard to his fault do not stop with those who undertake to use the chattel. [A restriction on the recovery by bystanders] is only the distorted shadow of a vanishing privity which is itself a reflection of the habit of viewing the problem as a commercial one between traders, rather than as part of the accident problem.'' (2 Harper and James, The Law of Torts (1956) p. 1572, fn. 6.)

If anything, bystanders should be entitled to greater protection than the consumer or user where injury to bystanders from the defect is reasonably foreseeable. Consumers and users, at least, have the opportunity to inspect for defects and to limit their purchases to articles manufactured by reputable manufacturers and sold by reputable retailers, whereas the bystander ordinarily has no such opportunities. In short, the bystander is in greater need of protection from defective products which are dangerous, and if any distinction should be made between bystanders and users, it should be made, contrary to the position of defendants, to extend greater liability in favor of the bystanders.

■ An automobile with a defectively connected drive shaft constitutes a substantial hazard on the highway not only to the driver and passenger of the car but also to pedestrians and other drivers. The public policy which protects the driver and passenger of the car should also protect the bystander, and where a driver or passenger of another car is injured due to defects in the manufacture of an automobile and without any fault of their own, they may recover from the manufacturer of the defective automobile.

It is urged that even assuming that the doctrine of strict liability in tort is available to an injured bystander in an action against the manufacturer, the doctrine should not be available against the retailer. In *Vandermark*, we considered the related question of the liability of the retailer to the purchaser and user, and we stated: "Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. (See *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff. In other cases the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety. Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship. Accordingly, as a retailer engaged in the business of distributing goods to the public, Maywood Bell is strictly liable in tort for personal injuries caused by defects in cars sold by it." (61 Cal.2d at pp. 262-263.)

All of the foregoing considerations are as applicable to the bystander's action as that of the purchaser or user, and we are satisfied that the doctrine of strict liability in tort is available in an action for personal injuries by a bystander against the manufacturer and the retailer.

The judgments are reversed.

Traynor, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.