[Crim. No. 14687. Second Dist., Div. Five. June 3, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. BILLY CHARLES DICKERSON, Defendant and Appellant.

Robert Valentino, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and George J. Roth, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—Defendant was convicted of having burglarized the trunks of two automobiles. (Pen. Code, § 459.)

One victim was Richard Richmond who had left his car on Santa Barbara Avenue, near Main Street, in Los Angeles on June 23, 1967. When he returned tools worth about $1,000, unspecified equipment, cameras, a tape recorder, tape recordings of his church choir and of a sermon he had preached and bags containing purchases, including six quarts of oil, had been removed from the trunk without his permission.

The other victim was Leon J. Green. The trunk of his car was burglarized between June 24 and 25, 1967, when it was parked in front of his house at 2727 West 43d Place. He lost a cigar box containing $50 in coins and $28 in currency, old, paid bills, two statements from his lawyer and several canceled checks.

On June 29, 1967, Mr. Menendez who lived in the same apartment house as defendant and whose apartment had been burglarized told Officer Helvin, who was in plain clothes and was investigating that burglary, that he suspected defendant of being "involved in some way." Just then defendant came walking down the hall. Helvin identified himself and asked defendant whether he had any identification. Defendant gave his name and said that he had no identification but that it was in his apartment. Either at the officer's request or voluntarily, defendant walked back to his apartment. He opened the door. Helvin saw an automobile tire and a bag of golf clubs in the living room. Defendant turned around and slammed the door from the outside. He announced that he did not have to show the officer any identification. The officer then took defendant to the police station. Helvin's testimony concerning the cause of arrest is instructive. ". . . A. Well, at this time we informed him that we were conducting a burglary investigation and that we would like to see some identification. He stated, 'I don't have to show you any,' and at this time, we said, 'Well, let's go to the station to establish your identification.' . . . Q. You arrested him at that time? A. *Temporarily.* Q. Temporarily? What does that mean, officer? I don't know what that means. A. Until we could establish his true identification. Q. What did you arrest him for? A. We had him in *temporary custody for burglary.* Q. Did you charge him with that crime at that point? A. In my estimation, at that time he *was temporarily in custody for burglary.* . . ." (Italics added.)

While Helvin and defendant were at the station, Menendez telephoned to say ". . . unknown parties were carrying miscellaneous items—he mentioned a tire and golf clubs—out of

the apartment number 208 and loading them into a car and that [Helvin] had better get down there right away.'' Helvin and another, uniformed, officer returned to the apartment where a lady, who identified herself as Mrs. Dickerson, opened the door. She was pregnant.[1] Helvin identified himself as a police officer and asked whether he could ''come in and look around.'' The lady asked whether he had a search warrant. He said that he did not.

Up to this point Helvin's and the lady's version of the events are identical. They do not, however, agree on what happened from then on.

According to Helvin he replied to the question about the search warrant as follows: ''No, we don't need one if you give us consent to come in and look around.'' To which the lady replied: ''Okay, then, you go ahead,'' or words to that effect.

The lady was a Miss Jones, who at the trial described herself as defendant's ''common law wife.'' She testified that after Officer Helvin had admitted that he did not have a search warrant he said: ''If you don't, the parole officer is going to come down and search it; so you might as well let us search.'' Miss Jones replied: ''I don't think I should let you do that,'' but Helvin just walked in, although she was standing in the doorway holding up her arm. She thought that he ''went under [her] arm.''

Once inside Helvin searched the apartment, and found, among other things, a large assortment of tools, cans of oil, check books, checks and recording tapes. He seized these items, which, at the preliminary hearing, were recognized by the victims as being part of the loot from the two burglaries.

■ Defendant contends that even if the seizure of the items found in his apartment was legal, the evidence is insufficient to convict him of burglary in that it shows nothing but possession of recently stolen property. In *People* v. *McFarland,* 58 Cal.2d 748, 754 [26 Cal.Rptr. 473, 376 P.2d 449] the applicable rule was restated as follows: ''Possession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt. . . .'' (See also *People* v. *Citrino,* 46 Cal.2d 284, 288 [294 P.2d 32].) The People argue that the necessary corroboration may be found in

---

[1] According to her testimony she was, at the time, having false labor pains. She gave birth to a baby four days later.

defendant's ". . . sudden decision to close the door after he went back to his apartment for identification, and the removal of numerous items from the apartment by his confederates after he was taken into custody. . . ." They also urge that an adverse inference may be drawn against defendant because he was "immediately alerted that his victim had identified him" when Menendez pointed him out in the hall. The problem with the last two arguments is that there is nothing but Menendez' inadmissible hearsay to prove the removal of items from the apartment and there is no evidence that his suspicions were correct as far as the burglary of which he was the victim is concerned. In any case, Menendez was not the victim of the burglaries charged and it is hard to see how consciousness of guilt with respect to him sheds much light on two burglaries with different victims.

With respect to the first argument, the People do not urge that there would be adequate corroboration if defendant had immediately refused to identify himself. Apparently it is the change of heart which is deemed to be of significance.

We do not have to decide whether the corroboration can be found in the belated refusal to produce identification. That issue has obvious constitutional overtones. On the other hand, it seems perfectly plain to us that the very nature of the goods possessed and other attributes of the possession itself may in a proper case supply the necessary corroboration. Fixed rules for the evaluation of evidence have a habit of requiring modification or reinterpretation when mirrored against the infinite variety of fact situations that arise after their promulgation. Suppose just one burglary is committed. From a burglar's point of view all or part of the loot is worthless junk. It is later found in the defendant's possession. Is this "mere possession" or a possession having a distinct quality which sheds some light on the mode of acquisition? Why would anyone possess property belonging to another which he would neither buy, beg nor borrow? We do not necessarily have to assume that he stole it, but we can assume that he got it in some unusual fashion or for some unusual reason. Now, if several such burglaries are committed and the defendant is shown to be in possession of items, useless to him, but stolen during each of the several burglaries, the inference that he is, in fact, the burglar becomes a very strong one indeed. The repetition of an otherwise senseless possession, coupled with our knowledge that someone had stolen the goods from their owners, reduces the likelihood that

that person is someone other than the defendant to the vanishing point.

The problem was discussed in the dissenting opinion in *People* v. *Champion,* 265 Cal.App.2d 29, 34 [71 Cal. Rptr. 113]. "Prior to *McFarland,* courts occasionally said that 'mere possession' of stolen goods was not enough. One difficulty with that language is that almost any case presents some other circumstances, e.g., the nature of the goods, the time, the place, the manner of possession. The real question in any case is the weight of the evidence as a whole. The *McFarland* opinion repudiated the 'mere possession' theory and expressly disapproved *People* v. *Chambers* (1861) 18 Cal. 382, which had held that possession of the loot is not 'of itself' sufficient to support a conviction for theft. . . . [P]ossession, under some circumstances, speaks for itself with sufficient authority to support a verdict. . . ."

In the case at bar we have two burglaries committed on different days at points some distance from each other. Part of the loot from one burglary—the bills and canceled checks—was quite worthless and found in defendant's possession. Part of the loot from the other burglary that was found may also have been without value, though the record is not too clear on the point. In fact, the case was tried as if the only issue worth talking about was the legality of the search. At a retrial the attributes of defendant's possession can be more intensively canvassed, so that the trier of fact will have more to work with and decide the issue in accordance with the views here expressed.

 There must be such a retrial. As the trial court saw it, the question of the legality of the search and seizure from defendant's apartment, boiled down to a question of credibility.[2] It chose to believe Officer Helvin, explaining its reasons as follows: "It seems to me that with the status of a loving common-law wife, who is a putative spouse, bearing this man's child, as opposed to this officer's testimony *who has no apparent interest—at least we have shown no interest in this matter*—except as a man performing his duties and being advised that someone was removing merchandise from the apartment where they had left sometime earlier, the Court has the problem of trying to decide, as you do in most criminal cases probably, whose testimony is the more reliable of the two. Unfortunately, the Court must find that the two stories—

[2] We do not necessarily agree. See text accompanying footnote 6.

*the officers' who have*[3] *not the motive nor the interest that
this other witness does*—are diametrically opposed statements
of facts.'' (Italics added.)

The court's criteria for weighing the officer's testimony
against that of Miss Jones are highly suspect.[4] We are
enjoined, however, (*People* v. *Risenhoover,* 70 Cal.2d 39,
57-58 [73 Cal.Rptr. 533, 447 P.2d 925]) to place the most
charitable interpretation possible on the court's remarks.
They can be understood, though perhaps with some difficulty,
not as announcing a general rule that police officers have no
interest in whether or not their searches and seizures are
found to have been legal, but as a finding that in this particu-
lar case, this particular officer's devotion to duty overcame
such interest. We therefore do not put our reversal on the
ground that the court applied an erroneous standard in
weighing the respective interests of police officers and bur-
glars' mistresses.

Later during the discussion between court and counsel the
court said: ''. . . Well, as I say, Counsel, I am faced with this
problem of deciding which one of these people to believe.

''The officers[5] said that they did not have a search warrant
and got permission to enter the premises, and the question of
the search warrant had been discussed, and the entry was
made with the party's consent; that they volunteered that
they didn't have a search warrant.

''As I said, we have these opposed stories. It is a question
of interest or bias or prejudice. *The Court must believe one or
the other.''* (Italics added.)

It being conceded that the search of defendant's apartment
was conducted without a warrant, the burden of proving that
the search was nevertheless legal was on the People. (*People*
v. *Burke,* 61 Cal.2d 575, 578 [39 Cal.Rptr. 531, 394 P.2d 67];
*Badillo* v. *Superior Court,* 46 Cal.2d 269, 272 [294 P.2d 23].)

---

[3]The use of the plural is puzzling, since Officer Helvin's partner, who
presumably overheard the conversation between Helvin and Miss Jones,
was never called as a witness. (See Evid. Code, § 412.)

[4]The court appears to have ignored: 1. that the natural desire of a
police officer to see a criminal brought to justice may cause him to be
less than candid in connection with a collateral inquiry which does not
go to what appears to him to be the only relevant question: was the
defendant a thief? 2. That law enforcement is often a ''competitive
enterprise'' (*Terry* v. *Ohio,* 392 U.S. 1, 12 [20 L.Ed.2d 889, 900, 88 S.Ct.
1868]; *Johnson* v. *United States,* 333 U.S. 10, 14 [92 L.Ed. 436, 440,
68 S.Ct. 367]; and 3. that a police officer who has conducted an illegal
search and seizure may be subject to criminal, civil and disciplinary
sanctions.

[5]Note again the use of the plural. See footnote 3 *ante.*

Rules allocating the burden of proof are specifically designed to aid the trier of fact who cannot decide which of two conflicting stories to believe. The court's statement that it "must believe one or the other" simply is not correct. If the court found itself unable to determine whether Officer Helvin or Miss Jones were speaking the truth, it was perfectly free to draw the legal consequence from its inability, that is to say, to hold that the prosecution had not carried its burden of proof. Since the court's finding was made pursuant to a nonexisting compulsion, it must be deemed erroneous.

We can appreciate the court's apparent reluctance to find the officer's version to be correct. It certainly approaches the inherently improbable. We can think of no reason why Miss Jones, who obviously was aware of the officer's need for a search warrant, should meekly consent when told that the officer had none, but that her permission would remove that cloud on his right to search. The only explanation that suggests itself is that Miss Jones' initial question was not prompted by a desire to assert her right that the apartment not be illegally searched, but by her concern, as a citizen, that the officer not violate the law.

It should be noted that we reverse because of a fatal flaw in the court's finding of a historical fact—that Miss Jones uttered words of consent. We therefore do not reach the more serious question of constitutional fact whether, assuming Officer Helvin's testimony to be true, a finding that there had been a voluntary waiver of a constitutional right is supportable. (*People* v. *Shelton*, 60 Cal.2d 740, 745-746 [36 Cal.Rptr. 433, 388 P.2d 665]; *Castaneda* v. *Superior Court*, 59 Cal.2d 439, 442-444 [30 Cal.Rptr. 1, 380 P.2d 641].)[6]

We have considered the question whether the issue of consent is a red herring beause in view of the information given to Helvin over the telephone he might have been justified in making an entry without warrant or consent to prevent destruction of evidence or further secretion of evidence. (*People* v. *Maddox*, 46 Cal.2d 301, 305 [294 P.2d 6].)[7]

---

[6]For a general discussion of the distinction between historical and constitutional facts see *Culombe* v. *Connecticut*, 367 U.S. 568, 603-606 [6 L.Ed.2d 1037, 1058-1059, 81 S.Ct. 1860]. The facts in *Lane* v. *Superior Court*, 271 Cal.App.2d 821 [76 Cal.Rptr. 895] were remarkably like Officer Helvin's version in this case. It was held that there was no consent as a matter of law.

[7]It will be recalled that the information that a tire and golf clubs were being moved out of the apartment came from Menendez. We should, perhaps, point out that there is no evidence in the record that the tire

No such justification for the search and seizure was put forward at the trial. For that reason the case is governed by *Giordenello* v. *United States,* 357 U.S. 480, 487 [2 L.Ed.2d 1503, 1510, 78 S.Ct. 1245] rather than by the reasoning of *People* v. *Chimel,* 68 Cal.2d 436, 440-441 [67 Cal.Rptr. 421, 439 P.2d 333]; Cert. granted *sub nom. Chimel* v. *California,* 393 U.S. 958 [21 L.Ed.2d 372, 89 S.Ct. 404]. (See also *People* v. *Hamilton,* 71 Cal.2d 176 [77 Cal.Rptr. 785, 454 P.2d 681], filed May 28, 1969.)

At the oral argument of this case the question was raised whether Helvin could rely on the consent of Miss Jones, given at a time when defendant, who was known to Helvin to be at least one of the tenants, was being held under an arguably illegal detention at the station. However, in view of the fact that this precise contention was not raised below and since further facts may be brought out at the retrial, we express no opinion on the point.

The judgment is reversed.

Stephens, J., and Aiso, J., concurred.

and golf clubs were stolen from anybody; nor did the People make any attempt to prove that Menendez' initial suspicions that defendant had burglarized his apartment were ever confirmed.