[L.A. No. 30772. Sept. 15, 1978.]

OSWALD DAWKINS, Plaintiff and Respondent, v.
CITY OF LOS ANGELES et al., Defendants and Appellants.

**COUNSEL**

Burt Pines, City Attorney, John T. Neville, Thomas C. Hokinson, Assistant City Attorneys, and Daniel U. Smith, Deputy City Attorney, for Defendants and Appellants.

D. Lowell Jensen, District Attorney (Alameda), John J. Meehan, Assistant District Attorney, William M. Baldwin and Wm. McKinstry, Deputy District Attorneys, as Amici Curiae on behalf of Defendants and Appellants.

Godfrey Isaac and Lawrence Jay Kraines for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Plaintiff brought an action against the City of Los Angeles and two of its police officers for false imprisonment and assault and battery. A jury found in his favor, and awarded him $100,000 in compensatory damages against the city and $5 against each police officer as punitive damages. On this appeal from the ensuing judgment, defendants contend that the trial court erred in refusing to instruct the jury that plaintiff was lawfully detained by the officers and that they had reasonable cause to arrest him. They assert also that the damages are excessive as a matter of law and that plaintiff's counsel was guilty of prejudicial misconduct during the course of the trial.

Plaintiff, a 44-year-old black male anesthesiologist, and an athlete, often jogged at night at the Los Angeles City College field, which was located a few blocks from the hospital where he was employed. The field was not lighted. While plaintiff was running on the track on April 17, 1973, about 10 p.m., a woman was assaulted in the vicinity of the athletic field by a black man. Plaintiff and two others who observed the events that evening testified at the trial.

Plaintiff testified that he heard a woman screaming, and walked in the direction of the sound. Near the steps leading to the track, he saw a black man assaulting a white woman. Plaintiff decided to intervene; as he approached the two, the assailant looked around, noticed plaintiff approaching, and walked down the stairs to the track and away from the scene. The victim, whose left side was injured, pulled herself up the stairs and out into the street above the track. Plaintiff sought to offer medical assistance, but she ignored his attempts to attract her attention and walked away. He then returned to the track and resumed jogging.[1] His apparel consisted of a track jogging suit with blue pants and shirt, with a stripe down the sides of the pants, a dark windbreaker jacket, a yellow knit cap, and red track shoes with white side markings.

Another witness and friend of plaintiff, Morris Moses, arrived at the field during the altercation. As he parked his car on the street above the stairs leading to the track, he heard a woman screaming for help and observed a large black man assaulting a woman. The man dragged the woman down the stairs and continued the attack on a stair landing. After

---

[1] Plaintiff testified that the man he observed weighed about 200 pounds, had a large "Afro" hair style, wore eyeglasses, and was wearing a black turtleneck sweater, a dark brown jacket with orange stripes, and ordinary street pants and shoes.

a few minutes, the assailant departed, proceeding down the stairs to the athletic field. Moses drove away, but returned to the track about five minutes later. A police car pulled up just as he arrived. Moses told the police that "the person who had committed the assault was down there" and he pointed to the track.

A third witness, known as Boom Boom Buttram, lived in an apartment building across the street from the field; he observed the assault from his window. He heard a woman screaming, and saw a muscular black man dragging her by the hair down the stairway leading to the field. He telephoned the police and reported the assault, and then proceeded to the street, arriving just as the victim staggered away. According to Buttram's testimony, when the police arrived, he told them that the suspect was "[d]own on the athletic field," but he did not point out plaintiff specifically as the suspect. He testified that he described the assailant to the police as a heavy black man five feet ten inches tall, wearing a dark woolen stocking roll-up type hat, a dark woolen pullover, probably a turtleneck, dark pants, and light sneakers or track shoes. He might have told the police that he had not taken his eyes off the assailant for a moment.

Officers Akesson and Ellington arrived at the scene about two minutes after they received a call on their car radio that a woman was being attacked near the Los Angeles City College track field. According to Akesson, Buttram told him that a black man had assaulted a girl on the sidewalk above the athletic field, had dragged her down the stairs leading to the field, and that the assailant was down on the field. Moses also told the police that the assailant was on the track. According to Akesson's testimony, he observed a man in running clothes on the track and Buttram pointed to the man and identified him as the assailant. Ellington testified that Buttram described the suspect as a male Negro approximately five feet ten inches in height, wearing dark athletic clothing. Akesson proceeded down the stairs and approached plaintiff. The evidence is in conflict as to what occurred thereafter.

According to plaintiff, about 15 minutes elapsed between the time he returned to the track and the police arrived. As he jogged over to greet Akesson, the officer said, "You have been pointed out." When plaintiff asked the reason, Akesson replied only, "come with me" and reached for plaintiff's elbow. Plaintiff did not attempt to run and did not raise his hand in anger, and he did not refuse to accompany the officer up to the street. Ellington then arrived at the scene, placed a hold over plaintiff's

head and neck, twisting his head up in the air, and applied pressure to his vocal cords. Plaintiff attempted to pull Ellington's arm away; Ellington lowered plaintiff to the ground and hit him on the head and shoulder with his baton. Both officers kneeled on plaintiff's body. Ellington called plaintiff a "black son of a bitch" and said "this will teach you to attack white girls."

Plaintiff was handcuffed, dragged up the stairs, and over his protests that he was a doctor, placed in the police car. At the police station, plaintiff's spiked running shoes were removed, and Ellington "stomped" on his instep. Plaintiff was released on bail after about three hours.

The officers relate a different story. According to them, Akesson, who first approached plaintiff on the track, told him that he was investigating an assault which had occurred minutes earlier, and plaintiff had been pointed out as the assailant. Plaintiff replied that he had been running at the track all evening and did not know about any assault. Akesson asked plaintiff to accompany him to the top of the stairs to talk with witnesses to the attack, but plaintiff refused. He was then placed under arrest. As Akesson reached for plaintiff's arm, plaintiff jerked away and clenched his fist in a fighting stance.

At this point, Ellington arrived, and he also told plaintiff that he was under arrest. The officer reached for plaintiff's right arm, and as he did so, plaintiff lunged forward and broke free of his grasp. Ellington then applied a bar arm hold, placing the flat of his wrist along plaintiff's throat, and applying pressure. Plaintiff was lowered to the ground, and as he struggled in the officers' grasp, Ellington struck him on the left shoulder with his sap, a blow which may have glanced off plaintiff's head. Plaintiff was handcuffed and taken up the stairs to the police car. At the police station, he was booked for resisting a police officer in the discharge of his duties. (Pen. Code, § 148.)[2] Ellington denied making the racial slurs attributed to him by plaintiff.

As a result of the incident, plaintiff suffered headaches and a backache. He had a cut on his left upper lip, and his voice was hoarse. His head and neck continued to hurt intermittently for three to six months, and he

[2]Section 148 provides: "Every person who wilfully resists, delays, or obstructs any public officer, in the discharge or attempt to discharge any duty of his office, when no other punishment is prescribed, is punishable by a fine not exceeding one thousand dollars, or by imprisonment in a county jail not exceeding one year, or by both such fine and imprisonment."

suffered psychological trauma. The medical expenses resulting from the altercation were $200.

The trial court instructed the jury on the standards applicable to their determination of the question whether the officers lawfully detained[3] and arrested plaintiff.[4] It refused an instruction offered by defendants that the detention was lawful and that the officers had reasonable cause to arrest plaintiff for assault. Defendants' motion for judgment notwithstanding the verdict and a new trial was denied.

██ In our view, the evidence establishes as a matter of law that the officers validly detained plaintiff for investigation and, therefore, an instruction to that effect should have been given. ██ However, the trial court was correct in refusing to instruct that plaintiff's arrest for assault was justified.

---

[3]The court told the jury: "You are instructed that every person who wilfully resists, delays, or obstructs any public officer in the discharge or attempt to discharge any duty of his office, commits a misdemeanor.

"The phrase 'in the discharge or attempt to discharge any duty of his office,' as used in this instruction, includes the lawful detention of or the lawful attempt to detain a person for questioning or investigation by a peace officer.

"A police officer is [a peace officer and as such is] a public officer within the meaning of this instruction.

"A peace officer may lawfully detain and question a person when the circumstances are such as would indicate to a reasonable man in a like position that such a course of conduct is necessary to the proper discharge of his duties.

"Temporary detention for questioning permits reasonable investigation, without the necessity of making an arrest. Although peace officers have the power to detain and question, there must be probable or reasonable cause to detain. Probable or reasonable cause to detain requires that there be some unusual or suspicious circumstance, or other demonstrable reason, warranting the investigation. Time, location, number of people, demeanor and conduct of a suspect, a recently reported crime, and the gravity of the crime, are among the factors that you may consider.

"The general grounds for a reasonable detention are:

"(1) There must be a rational suspicion by the peace officer that some activity out of the ordinary is taking place or has taken place;

"(2) Some indication must exist to connect the person under suspicion with the unusual activity; and

"(3) There must be some suggestion that the activity is related to a crime."

[4]The instruction was as follows: "You are instructed that a lawful arrest may be made by a peace officer without a warrant whenever he has reasonable cause to believe that the person arrested has committed a felony whether or not a felony has in fact been committed. A peace officer may also make an arrest without a warrant whenever he has reasonable cause to believe that the person arrested has committed a misdemeanor in his presence. The term 'reasonable cause' as used in these instructions mean[s] . . . such a state of fact[s] or circumstances confronting the officer at the time of the arrest as would lead a man of ordinary caution and prudence to believe and conscientiously entertain a strong suspicion that the person arrested had committed a felony or a misdemeanor in his presence."

██ ██ A police officer may detain a suspect for questioning " 'when the circumstances indicate to a reasonable man in a like position that such a course of action is called for in the proper discharge of the officer's duties . . . . The good faith suspicion which warrants an officer's detention of a person for investigative reasons is necessarily of a lesser standard than that required to effect an arrest . . . . Where there is a rational belief of criminal activity with which the suspect is connected, a detention for reasonable investigative procedures infringes no constitutional restraint.' " (*People* v. *Harris* (1975) 15 Cal.3d 384, 388-389 [124 Cal.Rptr. 536, 540 P.2d 632]; *People* v. *Flores* (1974) 12 Cal.3d 85, 91 [115 Cal.Rptr. 225, 524 P.2d 353].)

Applying this test to the facts of the present case, there is no question that the officers had a rational belief that a criminal act had taken place, since they had been informed both on the police radio and by witnesses at the scene of the crime that an assault had occurred near the athletic field. Two eyewitnesses reported that the assailant was still on the athletic field at the time the officers arrived, and that he was a black man, one identifying him as being dressed in casual clothes and athletic shoes.

The only serious question relating to the validity of the detention is whether the discrepancy between the description of the clothing worn by the assailant, as related to Akesson by Buttram, and the clothes actually worn by plaintiff, was significant enough so that the officers could not have rationally assumed that plaintiff and the suspect were the same person. As we have seen, Buttram informed the officers that the assailant was wearing a dark woolen stocking roll-up type hat, a dark woolen pullover, probably a turtleneck, dark pants, and light sneakers or track shoes. In fact, plaintiff was wearing a yellow knit cap, a blue jogging suit with a stripe on the pants, a dark windbreaker, and red track shoes with white markings. However, the general type of athletic attire described by Buttram was not significantly dissimilar to the clothes worn by plaintiff. The field was unlighted, and the officers may have been unable to discern that plaintiff was wearing a yellow cap and red track shoes with white markings rather than a dark woolen cap and light track shoes. The fact that plaintiff and his athletic attire fit the general description given by eyewitnesses, who told the officers that the assailant was on the athletic field, justified the officers in believing, at least for the purpose of investigation, that plaintiff was the assailant; the sportswear color

discrepancies urged by plaintiff were not sufficient to vitiate the reasonableness of the detention.[5]

■    Plaintiff asserts that 15 minutes had elapsed between the time he returned to the athletic field after the assault and the arrival of the officers, and that this passage of time should have placed the officers on notice that plaintiff might not be the assailant. However, the validity of the detention must be tested by the knowledge which the officers had at that time, and they testified they arrived at the scene about two minutes after receiving the call on their car radio; they could reasonably assume that the assault had occurred only a short time prior to the call.

Under all the circumstances, whether the officers had a good faith rational belief that plaintiff might be the assailant should not have been a factual question for the jury. It was, therefore, error to refuse the instruction offered by defendants that under the law plaintiff was properly detained for questioning.

■    However, the trial court correctly refused to instruct the jury that the officers had reasonable cause to arrest plaintiff for assault likely to produce great bodily harm. Defendants assert that the evidence established as a matter of law that there was probable cause to arrest plaintiff for the assault and for violating section 148 of the Penal Code. They rely in this connection upon the knowledge gained by the officers from eyewitnesses to the assault and upon plaintiff's conduct after the officers arrived on the athletic field.

As we have seen, the eyewitnesses told the police that the assailant was on the athletic field and gave them a general description of the suspect and his attire which justified the police in detaining plaintiff for questioning. However, the evidence was in conflict on the question whether plaintiff himself was pointed out as the suspect. The police claim that Buttram identified plaintiff as the assailant, while Buttram denied that he did so. Moreover, there was a clear conflict in the evidence with

---

[5]There is some confusion in the evidence as to whether another person was jogging on the track at the time these events occurred. According to plaintiff, he was the only person on the track at the time in question. However, Officer Akesson had a vague recollection that someone else was running halfway down the track. He made no attempt to question the other jogger, and could not recall how he was dressed. Even if there was in fact another runner on the track, this would not render plaintiff's detention unlawful. At most, it would have provided justification for also questioning the second runner about the assault.

regard to the events which occurred after the officers approached plaintiff.

We disagree with defendants' assertion that the jury was compelled to find in their favor on the issue of the lawfulness of the arrest because, according to plaintiff's own testimony, after one of the officers told him he had been "pointed out" and said "come with me," plaintiff asked why the request was made and what the charges were. We think it is obvious that these remarks cannot be said as a matter of law to amount either to suspicious conduct which could "transform an officer's suspicion into probable cause sufficient to support an arrest," in defendant's words, or probable cause to arrest for a violation of Penal Code section 148. Thus, the trial court correctly left the issue of the lawfulness of the arrest to the jury.

■ Nevertheless, the judgment must be reversed. The error in refusing to instruct the jury that the detention was lawful was prejudicial, for it is reasonably probable that a result more favorable to defendants would have been reached if the instruction had been given. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The court's instructions made clear that the detention of plaintiff could be justified by circumstances falling short of probable cause for the arrest (fns. 3 and 4, *ante,* p. 132), but the jury might nevertheless have determined that the detention was unlawful, and that therefore it followed without more that the arrest was also invalid. The lawfulness of the arrest was a critical issue; thus defendants were prejudiced by the court's error.

In view of our conclusion that the judgment must be reversed we are not required to consider defendants' claims that plaintiff's attorney was guilty of prejudicial misconduct and that the damages were excessive as a matter of law.

The judgment is reversed.

Clark, J., Richardson, J., and Newman, J., concurred.

**BIRD, C. J.**—I respectfully dissent.

Following a trial involving sharply conflicting testimony, a unanimous jury found that the defendants were liable to the plaintiff, Dr. Oswald

Dawkins, a 44-year-old black physician, for false imprisonment and for assault and battery. In so finding the jury had to give credence to the evidence most favorable to the plaintiff. That evidence showed that Dr. Dawkins, who had committed no offense, was accosted by police officers, arrested without adequate cause and without any investigation, assaulted by them although he did not resist, and insulted by racial epithets. That evidence further showed that the field notes of this incident were destroyed after the police realized they had beaten an innocent man and might face a lawsuit.

The majority hold that this jury verdict must be set aside because the jury should have been instructed that, *as a matter of law,* it had to find the "detention" of the doctor was justified. In order to so hold, the majority must ignore the facts which the jury found to be true; they must disregard reasonable inferences that the jury could draw from those facts; they must credit witnesses whose testimony the jury obviously did not believe; and they must resolve conflicting evidence and inferences in favor of the parties who lost below. Examining the record in the light most favorable to the jury's verdict, as this court is required to do, it is clear that there were ample facts which fully support a determination that there was not a lawful detention in this case.

## I

In ruling on whether a jury's finding should be set aside for insufficient evidence, "the power of the appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support [that] finding . . . ." (*Grainger* v. *Antoyan* (1957) 48 Cal.2d 805, 807 [313 P.2d 848]; italics in original.) "In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the respondent [here, Dr. Dawkins], and all legitimate and reasonable inferences [must be] indulged in to uphold the verdict if possible." (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) If there is any reasonable doubt as to the sufficiency of the evidence to sustain a finding, an appellate court "should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, *the court should be realistic and practical.*" (*Estate of Bristol* (1943) 23 Cal.2d 221, 223-224 [143 P.2d 689]; italics added.)[1]

---

[1]In the present case, these rules are more than mere appellate formalisms. Despite conflicting testimony from the police officers, unanimous juries have ruled in favor of Dr. Dawkins both in this lawsuit and in a prior criminal complaint filed against him.

The testimony believed by the jury in the present case established the following facts. In April 1973, Dr. Oswald Dawkins, a physician and a member of the United States International track team, was employed as an anesthesiologist at Cedars of Lebanon Hospital in Los Angeles. After completing several difficult operations at the hospital on the evening of April 17, Dr. Dawkins went to the Los Angeles City College track, a facility near the hospital that was commonly used at night by runners. While running his "sprint work-out," Dr. Dawkins heard shouting and shrieking noises coming from the end of the track where a stairway led to Willowbrook Street. A minute or so later, Dr. Dawkins saw a black man and a white woman on the landing halfway up the stairs. The man was hitting and kicking the woman. Dr. Dawkins approached the two people, and when the man saw Dr. Dawkins, he put his hands in his pockets, and walked down the stairs past Dr. Dawkins.

The woman, meanwhile, had dragged herself up the steps to Willow-brook Street. It appeared to Dr. Dawkins that the woman had a broken or dislocated left shoulder. He attempted to mount the concrete stairway in his running spikes in order to offer her medical assistance. However, she paid no attention to him and continued to walk away, so he returned to the track and resumed his workout.

Morris Moses, a specification engineer, observed the incident from the street level. As the injured woman passed Moses, he also offered her assistance, but she replied, "No, I don't want his forty dollars and I don't want to go to his apartment" and kept on walking.[2] Moses drove away from the track but returned shortly thereafter to find two police officers on the scene. Moses indicated to them that the suspect was down on the field. He was not asked for nor did he give the officers a description of the suspect. The officers "paid no attention" to Moses and stated, "We will take care of him first." One officer proceeded down the steps, followed shortly by the other.

About 15 minutes after interrupting the fight on the landing, Dr. Dawkins saw a man coming down the stairway. As the man passed under the lights at the landing, Dr. Dawkins noticed it was a police officer and jogged over in order to tell him what he had seen.

The two men met on the cinder track. Dr. Dawkins said, "Hello, officer." The officer, who turned out to be Officer Akesson, pointed to Dr.

---

[2]Despite a search of the area and local hospitals, the woman was never located by the police.

Dawkins and said, "You have been pointed out." Dr. Dawkins asked, "What for?" Officer Akesson replied, "Come with me" and grabbed Dr. Dawkins' elbow. Dr. Dawkins did not know where he was being taken or why. He asked, "What are the charges?" Officer Akesson, who had not mentioned any assault or investigation, responded by drawing his baton and raising it over Dr. Dawkins' head.

At that moment, a second officer, Ellington, ran behind Dr. Dawkins, and, without saying a word, applied a "bar arm" choke hold across his throat. Officer Ellington began twisting his neck and cutting off the supply of oxygen to his brain. Dr. Dawkins thought the officer was trying to kill him[3] and grabbed the officer's arm to prevent being strangled. Officer Ellington "took" Dr. Dawkins to the ground. By this time, the doctor was in a "half dazed, half suffocated state." Officer Ellington placed his knee on Dr. Dawkins' chest while someone else was "hitting or holding" his legs. From this position, Officer Ellington hit Dr. Dawkins on the forehead and shoulder areas with his "sap."[4] As he was striking Dr. Dawkins, Officer Ellington said, "You black son of a bitch. This will teach you to attack white girls."

After two or three minutes, Dr. Dawkins was rolled onto his side, handcuffed, raised to his feet, frisked, and dragged up the stairs to the street. Enroute, Dr. Dawkins regained "enough voice to protest," but Officer Ellington said, "You black son of a bitch, shut up."

Morris Moses looked down the stairway after the officers descended. He saw them standing close to a man on the field, and "within a matter of seconds" the officers had knocked the man down. Moses did not see what happened on the ground, but when the officers brought the man up, Moses recognized him as his acquaintance, Dr. Dawkins. Moses was upset and told the officers, "I think you have got the wrong man."[5] He informed them that Dr. Dawkins was an anesthesiologist. Thereafter,

[3]A police officer brought in to testify as an expert in police tactics on behalf of the defendants admitted that "you can kill a man with a bar arm control" of the sort Officer Ellington was using on Dr. Dawkins.

[4]A "sap" is more commonly known as a "blackjack." (*People* v. *McKinney* (1935) 9 Cal.App.2d 523, 524 [50 P.2d 827]; Webster's New Internat. Dict. (3d ed. 1961) p. 2013.) It is "a small striking weapon typically consisting at the striking end of a leather-enclosed piece of lead or other heavy metal and at the handle end of a strap or springy shaft that increases the force of impact." (Webster's New Internat. Dict., *supra*, at p. 226.)

[5]Moses *knew*, in fact, that Dr. Dawkins was the wrong man and that he did not resemble the suspect. He testified, "I wanted [my statement to the officers] to be more direct but frankly I was a little intimidated by the violence of the whole thing."

Moses testified, one of the officers called Dr. Dawkins a "black son of a bitch." Dr. Dawkins was transported to jail and booked.

In his testimony, Officer Akesson insisted that, in a conversation occurring at the street level prior to descending the stairway, one witness (Boom Boom Buttram) had specifically pointed to Dr. Dawkins as the suspect who had assaulted the woman on the landing. However, this witness, called on behalf of the defendants below, vehemently denied he pointed to any person in the field, saying, "That would have been impossible, Mr. Counsellor, because I did not see anybody in the field." In addition, Officer Ellington testified he "never saw anyone pointing out any individual on the field."

Officer Ellington asserted that Buttram furnished a cursory description of the suspect. (Cf., *post,* pp. 141-142) The officer claimed he had written down the description furnished by Buttram on a field interrogation card. However, he destroyed the card on the night of the arrest, even though he was concerned about the possibility of a lawsuit being filed against him by Dr. Dawkins for the false arrest and the injuries inflicted.[6]

## II

A common sense consideration of this evidence suggests several reasonable theories on which the jury could—and, clearly, did—conclude there was no lawful detention for investigation. For example, the jury could rationally conclude there was no detention whatsoever, merely an immediate, precipitous effort by Officer Akesson to arrest Dr. Dawkins without conducting any investigation. (Cf. *People* v. *Mickelson* (1963) 59 Cal.2d 448, 454 [30 Cal.Rptr. 18, 380 P.2d 658].) Officer Akesson testified he had formed an intent to "arrest . . . or at least detain" Dr. Dawkins before he descended the stairway. Plainly, the jury was entitled to determine which of these two intentions he actually carried out. Both his words and his actions are instructive on this point. The officer's first words to Dr. Dawkins were: "You have been pointed out. Come with me." These were words of arrest, not of investigation, and were accompanied by the officer grabbing Dr. Dawkins' elbow. The officer conducted no investigation: he stated no purpose, asked no question, demanded no explanation, did not request identification, refused to answer Dr.

---

[6]The remainder of the testimony mentioned in the majority opinion was elicited from the three main defense witnesses, the two officers and Boom Boom Buttram. The jury verdict indicates that much of this testimony was rejected as false or mistaken. The record amply supports the jury's rejection of this testimony, see pages 141-142.

Dawkins' reasonable inquiries, and, within seconds, threatened to enforce his summary order with a baton. It can scarcely be deemed to be irrational behavior for a jury to conclude there was no "temporary detention for questioning"[7] here in light of the fact the officer never manifested any intent to ask questions or otherwise investigate. Rather, his behavior was a clear order to Dr. Dawkins requesting "submission to the custody of an officer," which constituted an arrest. (Pen. Code, § 835.) This conclusion was bolstered by the admission of Officer Ellington that, upon running up to the scene and without in any way investigating, he immediately "inform[ed] [Dr. Dawkins] he was under arrest and to accompany me to the car . . . ."

Even if it were assumed that there had been a detention, the jury could conclude the detention was improper. The majority note that a detention to investigate whether an individual is a suspect in a known crime has been measured by whether the officers had a "good faith rational belief" that he is the suspect.[8] (Maj. opn., *ante,* at p. 134.) Yet the majority inexplicably fail to examine whether the jury might have reasonably concluded that this detention was not made in "good faith." Consider the facts which the jury found to be true. One officer accosted Dr. Dawkins, conducted no investigation, and fabricated a statement that Dr. Dawkins had been "pointed out" as a suspect. Within a matter of seconds, as soon as the officer's partner arrived on the scene, Dr. Dawkins was assaulted, although he had not raised his voice[9] or displayed any aggressive or uncooperative behavior. Officer Ellington, who weighed about 200 pounds, choked Dr. Dawkins for over a minute, twisted his neck, dragged him to the ground, kneeled on his chest, and proceeded to strike him "very hard"[10] with a sap, while yelling, "You black son of a bitch. This will teach you to assault white girls." Although Officer Ellington had been instructed "not to hit an individual on the head if at all possible with the sap," he struck Dr. Dawkins on the forehead.[11] The racial slurs continued

---

[7]*People* v. *Mickelson, supra,* 59 Cal.2d at page 452.

[8]The considerations involved in such a detention situation are somewhat different than those where the detention is based solely on "suspicious circumstances." (*In re Tony C.* (1978) 21 Cal.3d 888, at p. 909, fn. 4 [148 Cal.Rptr. 366, 582 P.2d 957] (conc. and dis. opn., of Bird, C. J.).)

[9]Both Dr. Dawkins and Officer Akesson testified that the doctor spoke in his normal, quiet tone of voice prior to the assault. Officer Ellington claimed he could hear Dr. Dawkins "protesting in a loud voice" as he was running down the stairs.

[10]The quoted words are from Officer Ellington's testimony.

[11]Dr. Dawkins and Officer Akesson both so testified. Officer Ellington denied hitting Dr. Dawkins' head with the sap.

even after Morris Moses informed the officers that they had the wrong man and that Dr. Dawkins was a local physician not a "black son of a bitch."

This evidence was sufficient for a jury to conclude that the officers did not act in good faith. It is difficult to imagine what greater showing the majority could have expected on this point, yet there was more. The majority rely on the alleged description of the suspect by Boom Boom Buttram. Assuming, arguendo, that this reliance is appropriate,[12] the discrepancies between Buttram's description and the actual appearance of Dr. Dawkins were striking. Buttram claimed to have told the police the suspect wore "a heavy woolen turtleneck sweater," a "dark brown" cap, dark street pants of solid color, "white" sneakers or track shoes, and no jacket. In fact, Dr. Dawkins wore *no* turtleneck sweater, a *yellow* cap, blue sweat pants with a "big white stripe" down each leg, predominantly *red* spikes, and a heavy *jacket.* Buttram further claimed the suspect was "heavy, stout, chunky," a description which did not fit Dr. Dawkins. The only part of the description that matched was the fact that Dr. Dawkins was a black man. On this record, how can the majority hold that it was irrational "as a matter of law" for the jury to conclude that the officers did not act in good faith—the officers disregarded all the elements of a furnished description except the suspect's race; they accosted the first man of that race they encountered; they proceeded to assault him and hurl racial slurs at him; and they subsequently destroyed the only notes which contained the alleged description.

### III

The majority argue that the detention was proper as a matter of law because (1) the "general description given by eyewitnesses" to the police largely fit Dr. Dawkins and (2) the officers "may have been unable to discern" the discrepancies between the description and Dr. Dawkins. (Maj. opn., *ante,* at p. 133.) The record indicates that the alleged "general description" was not reasonably consistent with Dr. Dawkins' appearance. Moreover, the evidence as to whether the officers had *any* description of the suspect before they arrested Dr. Dawkins was conflicting. Morris Moses specifically denied he gave a description to the officers. The three percipient defense witnesses contradicted each other on this point. Officer Akesson, who initially "detained" Dr. Dawkins, did not remember Boom Boom Buttram giving a description of the suspect

---

[12]See *post,* at pages 141-142.

prior to the encounter. He insisted that the basis for the encounter was Buttram's pointing out Dr. Dawkins on the field. Buttram, however, vehemently denied he pointed to any person, claiming he gave some officer a detailed description of the suspect. Finally, Officer Ellington did not see "anyone pointing out any individual on the field." He asserted that Buttram furnished a *cursory* description of the suspect which, curiously enough, did not include any of the details that were inconsistent with Dr. Dawkins' appearance. (Cf., *ante,* at p. 141.) He admitted he destroyed the card on which the description had allegedly been written.

Surely on this state of the record, the jury could rationally disregard the testimony concerning a prearrest identification or description. At the very least, the jury could have concluded that the defendants had failed to meet their burden on this issue. As with all warrantless intrusions, the burden of justifying a detention lies with the government, and the jury here was properly instructed that the defendants had the burden of establishing the legality of the detention of Dr. Dawkins. The mass of conflicting evidence presented by the witnesses for the defendants on this issue and elsewhere in the trial[13] would have amply justified the jury finding that the defense simply "had not carried its burden of proof." (*People* v. *Dickerson* (1969) 273 Cal.App.2d 645, 651 [78 Cal.Rptr. 400].)

Even if Officer Akesson had some kind of a description from Buttram, as the majority assume, they err in holding that the detention was legal based on the supposition that the officers "may not have been

---

[13]It would unnecessarily extend the length of this opinion to recite all of the instances in which the three main defense witnesses contradicted each other and their own testimony. A few examples, however, are illustrative. Buttram testified that he tried to watch the arrest of Dr. Dawkins from the landing on the stairway. He also admitted that in previous testimony in 1973, he had indicated he did not go down to the landing. The following colloquoy occurred next:

"Q. [by plaintiff's counsel]: . . . My point is were you telling the truth in '73 or are you telling the truth now about going down to the landing?

"A. [by Buttram]: I always tell the truth.

"Q. Then both are true that you did and you did not?

"A. Right."

At another point, Buttram testified he saw the perpetrator of the assault come to the top of the stairway after the woman had staggered away. Buttram was asked how close he came to the perpetrator on this occasion and he replied, "the closest we could have been is a couple of feet [apart] and the farthest would be the distance across that street; maybe fifty feet."

The officers fared little better. Officer Akesson testified that as he reached for Dr. Dawkins' elbow, Dr. Dawkins "immediately lunged forward." However, Officer Ellington claimed Dr. Dawkins "stepped back," and, when his attention was brought to the contrasting testimony of Officer Akesson, he explained that "part of [Dr. Dawkins'] motion was forward and part of it was backwards."

able to discern" the discrepancies between Dr. Dawkins' appearance and the description allegedly given to them. The issue here is not what "may . . . have been" but whether *as a matter of law* the jury could *only* find the officers were unable to discern the discrepancies. Neither officer claimed he had such an inability. On the contrary, Officer Ellington testified that although the track was unlit, "[o]nce down there, you could see what you were doing." Moreover, both officers asserted that from street level they were able to perceive people on the track 100 feet away. Obviously, the jury could conclude that, if the officers did have Buttram's description, they would be able to "discern" the discrepancies between that description and Dr. Dawkins' appearance. "The fact that some inference other than that which has been drawn by a jury may appear to an appellate tribunal to be more reasonable, affords no sufficient reason for disturbing the inference in question." (*Hamilton* v. *Pacific Elec. Ry. Co.* (1939) 12 Cal.2d 598, 602-603 [86 P.2d 829].)

IV

The majority have lost sight of the established principles of law which apply to this appeal. When the issue involves whether a jury should have been instructed to make a certain finding as a matter of law, this court must "consider the evidence in the record which is most favorable to [plaintiff] and [which] must be accepted as true." (*Dailey* v. *Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 745 [87 Cal.Rptr. 376, 470 P.2d 360].) This court must give to that evidence "all the value to which it is legally entitled" and must "indulg[e] in every legitimate inference which may be drawn from the evidence in [plaintiff's] favor . . . ." (*Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84].) Unless "it can be said that there is no evidence to support a jury verdict in [plaintiff's] favor," this court may not reverse. (*Ibid.*) Sadly, these rules are honored by this court today only in their breach.

Tobriner, J., and Manuel, J., concurred.

Respondent's petition for a rehearing was denied October 25, 1978, and the opinion was modified to read as printed above. Bird, C. J., and Manuel, J., were of the opinion that the petition should be granted.