Filed 3/9/23  Z.A. v. F.T. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| Z.A., | C095538 |
| Plaintiff and Appellant, | (Super. Ct. No. FL2021-79) |
| v. | |
| F.T., | |
| Defendant and Respondent. | |

This is an unusual case.  Z.A. (wife) requested a domestic violence restraining order (restraining order) against F.T. (husband).[1]  She alleged multiple instances of abuse in her request.

The trial court granted a temporary restraining order and set the matter for hearing.  The terms of the temporary restraining order included that husband would move out of the family home; wife would have exclusive use, control, and possession of the home;

---

[1]     We granted wife's request to use only initials in the opinion.

and husband would pay the $2,500 mortgage for the duration of the temporary restraining order.

Following the evidentiary hearing, the trial court made detailed findings and granted wife a restraining order after hearing (hearing order) for a three-year term. The trial court explained it considered "the totality of all the information" but "the reason why [it was] going to grant a restraining order" was because (1) after the parties agreed to live in their home peacefully and civilly while pursuing a divorce, each with equal access to their young daughter, husband deprived wife of seeing the couple's daughter until wife agreed to a child custody arrangement; and (2) husband transferred the title to the couple's home to his father and "out from under [wife] without any explanation." The trial court further explained it was granting a three-year term because of the abusive comments husband made to wife. The trial court did not discuss, nor did either party raise, any specific terms to be included in the hearing order.

Wife's counsel offered to prepare the proposed hearing order, and the trial court thanked her for doing so. Although it was never orally pronounced by the trial court, the minute order provided the hearing order would be on the same terms and conditions as the temporary restraining order.[2] Wife's counsel prepared the proposed hearing order and, without providing a copy of the proposed order to husband's counsel, submitted it to the trial court for signature.

The trial court signed the proposed hearing order but, eleven days later, notified the parties it was reconsidering the three-year term of the hearing order on its own motion. During the two hearings that followed, the trial court explained it was concerned about the three-year term given the facts of the case and that it had not given husband's counsel sufficient time to argue for a lower term. The trial court was also surprised and

_____

[2]     We have found no mention of such an oral pronouncement in the reporter's transcript; wife cites solely to the minute order.

2

concerned to find a mortgage payment provision in the hearing order, which required husband to pay the $2,500 mortgage for the duration of the order—a term the trial court found "somewhat unusual," particularly because it "was not discussed by anybody." The trial court ultimately reduced the term of the hearing order from three years to two years and struck the mortgage payment provision.

Wife appeals and seeks to reinstate the original terms of the hearing order. Wife asserts (1) the trial court's decision to strike the mortgage payment provision was "legal error and an abuse of discretion" because the trial court's ruling was "premised on a faulty legal conclusion that the [Domestic Violence Prevention Act (Act) (Fam. Code,[3] § 6200 et seq.)] does not authorize mortgage or other debt payment terms in [restraining orders]"; and (2) the trial court abused its discretion when it reduced the duration of the hearing order from three years to two years because the trial court's ruling was premised on "its belief that there was no physical violence," a finding not supported by substantial evidence and contradicted by the trial court's prior finding that husband "had committed acts of physical abuse." Husband did not file a respondent's brief.

We affirm. Wife's opening brief is passionate and her arguments, at first glance, appear to have merit. A fair reading of the record, however, reveals there is no basis for reversing the trial court's modification of the hearing order.

FACTUAL AND PROCEDURAL BACKGROUND

On January 19, 2021, wife filed a request for a restraining order against husband, seeking protection for herself and the couple's daughter. Wife alleged the parties were married on December 15, 2017, and separated on January 5, 2021. The couple's daughter was approximately 18 months old when wife filed the restraining order request. Wife sought, among other things, personal conduct orders, a stay-away order, and a move-out

---

**3**     Undesignated statutory references are to the Family Code.

order. She further requested temporary use, possession, and control of the couple's residence and a directive for husband to pay the mortgage of $2,500 per month while the restraining order remained in effect.

The following five paragraphs generally recite wife's allegations in the restraining order request. Husband once, prior to marriage, slapped wife on the side of her head while they were driving; and, in May 2020, husband threw mail in wife's face because he was upset that wife had retrieved the mail. Husband threatened wife that "worse things would happen" if she looked at his mail again and he thereafter restricted her access to the mail key. Husband was "very controlling of [wife] and [the couple's] finances," would not give wife access to the community property funds or bank account, and would "yell at [wife] and belittle [her] for being poor." As to the couple's daughter, wife alleged husband "plays aggressively with [her], pulling her hair, biting her cheeks, and squeezing her until she cries" because "he was trying to 'toughen her up.' "

On January 3, 2021, after wife had a disagreement with her father-in-law about "the 'place of women' and how women should do as they are told," she left the couple's residence and went to Fresno to see her family "while things cooled off." Husband would not allow wife to take their car. On January 5, 2021, the couple discussed separation. When wife returned to the couple's residence on January 9, 2021, she was unable to gain access. Wife called the police and a locksmith for assistance. Husband approached the house when the locksmith arrived, argued with wife "over what personal items [she] could take," aggressively snatched personal belongings from wife's hands, and belittled wife. Husband told wife she could only return to their home if she agreed that husband's brother would stay with them, wife would not drive the couple's car, and security cameras would remain installed at the home.

Wife sought the assistance of counsel, and the couple agreed to live in the home together civilly and peacefully, neither of the couple's family members would be allowed at the home without the express consent of both parties, the couple would have equal

access to the home's security cameras, and the couple's daughter would not be left in the care of wife's or husband's parents for an overnight period.

On January 16, 2021, wife returned to the couple's home. Shortly thereafter, husband absconded with the couple's daughter, took or destroyed some of wife's belongings, and declined to give wife the log-in information for the security cameras. Husband gave the couple's daughter to his father and told wife he "intend[ed] to withhold [their] daughter" until wife signed a child custody agreement.

Wife alleged she had no income and, because she "could not stay in [the] marital home because of [husband's] hostility toward [her]" and husband provided no child support, she "had been living off credit cards" and had to stay with family.

The trial court issued a temporary restraining order on January 20, 2021, and set the matter for hearing. The terms of the temporary restraining order included that husband would move out of the couple's home; wife would have exclusive use, control, and possession of the home; and husband would pay the $2,500 mortgage for the duration of the temporary restraining order.

The trial court conducted an evidentiary hearing regarding the restraining order request over several days. We do not recite the testimony presented at the evidentiary hearing because the trial court discussed the testimony in great detail in its June 17, 2021 ruling, as set forth *post*, and wife takes no issue with the factual findings in that ruling.

The trial court said it considered "the totality of all the information that was presented in evaluating whether a restraining order should issue in this case" and was mindful that "there is a huge cultural and religious overlay to this case," particularly "in terms of expectations of women and their role in the household." Before delving into the evidence, the trial court made several credibility findings.

The trial court found husband lacked credibility regarding his finances; the evidence showed husband was purchasing homes and participating in "an active car sales operation." The trial court found wife "is a strong woman . . . moving against culture" in

5

that she did not agree with the expectations placed upon her "by the community she was raised in," her family, "and, perhaps, religion." In the trial court's view, wife's statements and "the text messages and the expressions exchanged between [husband] and his wife" indicated wife was not "a shrinking wall flower," "had learned to fight back," and "was able to stand her ground."

Husband's father "appeared to the Court as the quintessential patriarch" with strong views and "his own sense of what was appropriate." Husband's father was "also a generous man financially." He helped "to finance his daughter-in-law's education for the better part of two years" and made generous gifts to wife's family, including a $15,000 loan to pay off a debt. Husband's father also paid for trips to the Middle East and Florida.

Finally, the trial court addressed the credibility of wife's sister and wife's brother-in-law (who was married to wife's sister). The trial court found them to be "believable, as having credibility" but explained "the problem for the Court" was that "both sides had an ax to grind" and had "an interest." Thus, the trial court expressed, it would consider the testimony with the recognition "that there was an interest."

Turning to the merits of wife's restraining order request, the trial court first addressed physical abuse allegations: "[Wife] herself told us about an incident that happened prior to the marriage in December of 2017, where when they were driving in the car, [husband] behind the wheel, she, with her hand on an ice[d] coffee, or something to that effect, she went to touch her husband on the neck and he backhanded her on the head, I think, words to that effect. [¶] It had such an influence on her that she contemplated not going forward with the marriage. The families got together and found a way through this and the marriage went forward anyway."

The trial court further detailed wife's brother-in-law's testimony that husband would sometimes push, shove, and strike wife (e.g., "punching her upper arm"), which wife's brother-in-law "found . . . funny." The trial court noted, however, it was

6

"interesting in going through the transcript [wife] never mentions anything about that"; "there was no mention of, that the Court could find[,] of physical abuse." Wife's testimony that she "was a punching bag" pertained only to her recitation of "various verbal and emotional assaults." Wife's sister also did not mention any physical abuse.

In considering whether the physical abuse allegations could "be a basis" for issuing the restraining order, the trial court questioned, "[W]hy, if that were going on, [wife] would want to move back into the house, taking her child back into the home where this type of physical abuse would have been going on." The trial court continued, although it was "not unusual to see victims of crime or abuse going back into the household," it gave the court "pause in terms of concluding that a basis for the issuance of a restraining order in this case should be granted on physical abuse." The trial court found the restraining order "cannot be based on that theory alone" but said it would weigh the physical abuse evidence "in determining whether or not in the totality of the circumstances a restraining order should issue."

The trial court next considered wife's allegations of child abuse. The trial court noted the testimony of wife's sister and wife's brother-in-law, who "both accounted for or both explained that in their experience they would see [husband] often squeezing the baby really tightly until the baby would begin to cry." The trial court further noted testimony that husband would shake and yell at his daughter until she cried and, when someone would tell husband that he was hurting the child or ask him to stop, husband would reply "she's my daughter," "I'm teaching her to be strong," "I can do with her what I want," and "[i]t's to make her tough or to toughen her up." The trial court, however, explained that wife "ma[de] no mention of these episodes with regard to the child" and queried why wife would subject her daughter to such abuse, if it in fact occurred, rather than staying in Fresno with her mother and sister. The trial court further noted that husband's friend testified he never saw husband "roughing up" or "physically abusing" his daughter. The trial court found the restraining order could not issue based

7

on the child abuse allegations, but said it could "certainly take that [into] account" in considering whether the restraining order should issue based on the totality of the circumstances.

The trial court next collectively considered the allegations of financial abuse and coercion and control because some of the evidence was intertwined—such as husband's refusal to allow wife to drive their car to Fresno when "she needed space to clear her head" on or around January 3, 2021. The trial court found plausible husband's argument that he did not want wife and their daughter to take the electric vehicle to Fresno because husband was concerned about the "safety risk" if wife had to recharge the car on the way. The trial court noted, however, that wife testified she had previously driven to Fresno without needing to recharge the car. Although husband's father testified he offered a truck to wife as an alternative vehicle, no one corroborated his testimony. The trial court explained the allegation regarding husband's control of the car "is more in the field of coercion and control, but it at least fits in the argument, perhaps, of the financial type of abuse, denying her access to some [asset] that she normally would have access to."

The trial court found wife did not have access to part of husband's earnings because it was placed in husband's business accounts and said, "[T]he argument was made that it was a constant refrain of having to ask for money and being denied access to some of the other community assets income [*sic*] that her husband had acquired through his business." The trial court explained, "[I]t is part of the theory of the financial abuse, depriving her of access to community funds."

Also, as to the financial abuse allegations, the trial court found, as "[a]n important feature," "the financial benefits that were provided to [wife] during the course of the marriage." For example, husband and husband's father "literally paid for [wife's] education for the last two years" and "there were trips that were subsidized by [husband's father] and, perhaps, [husband], for which she was the beneficiary." Wife "also lived in a nice home that was bought by the father-in-law" and paid monthly by husband. Wife

8

earned income "when she was not going to school," but the money she earned went to her mother for babysitting services her mother provided from October to December 2020.

The trial court ultimately found it could not issue the restraining order based on the financial abuse allegations, explaining:  "There was a lot of financial benefit and there were some shortcomings in terms of, perhaps, the demeaning need to ask for funds readily and regularly from . . . husband, whose financial dealings were pretty hard to figure out, to say the least."

Turning to the emotional and verbal abuse allegations, the trial court noted wife's and her sister's testimony regarding husband's statements that wife "would not amount to anything, that she came from nothing, and she should be happy that she's with a spouse like him, who is basically more successful."  Wife testified the verbal abuse happened frequently and she was "his punching bag" in that he was always reminding her that she "came from nothing."  When wife received good news about her grade point average, husband told her the school she was attending was "for dropouts, ghetto people go there." Wife also "report[ed]" that husband "body shamed" her, made comments that she "look[ed] like an elephant" and was fat, and said "no one would want her as a single mom, if she chose to leave the marriage."  The trial court noted wife's sister and wife's brother-in-law echoed wife's testimony that husband told wife she was fat.

Wife testified husband's father constantly told wife "she had no rights as a woman" and her "job as a housewife [was] to respect her father-in-law's rules and her husband's rules."  With regard to a verbal exchange between wife and husband's father during a car ride home from San Francisco, wife testified she "wasn't going to accept his, meaning [husband's father's,] apology" because it "wasn't the first time that he had verbally abused [her], and this time [she] wasn't going to take it."  Wife "reported to her husband" that his father "did something very disrespectful" and she thus "had to leave." When wife was asked what would happen "if she didn't follow the rules being laid down, she said [husband] would threaten [her] by taking away [her] personal belongings."  The

9

trial court explained, "That was the tone of the comments and throughout her testimony that was her report as to the type of verbal and emotional abuse that was tossed her way during the course of the [marriage]. Of course, that would get very tiring very fast if you are on the receiving end of it." The trial court found the "comments constituting verbal and emotional abuse" were "significant events."

The trial court, however, also recounted husband's friend's testimony that wife had "made some derogatory comments about her husband's appearance, saying that he was an embarrassment to her, he was not very good looking, and that she and her former boyfriend" were described as a "handsome couple." The court noted husband's father testified he had also heard wife's derogatory statements about husband. The trial court said, "[A]t least in this instance[,] you saw somebody who was fighting back and had her own things to say, which were cutting and cruel in their own way." "[T]here are no absolute heroes in this story in the Court's view."

Returning to the coercion and control allegations, the trial court mentioned wife testified her father-in-law made negative comments about her and her sister and told wife that she "had no right to have her family over to the house," her place as a woman was to stay silent and to respect her in-laws, and the marital home was "not her house" but instead husband's house. The court also mentioned wife's testimony that husband said "his father is in control and that [she] need[ed] to abide by his and his father's rules"; "she was not allowed to take the Tesla and to leave the keys behind"; and she needed to "think about her decision wisely before deciding to come back" to the house.

The trial court recounted that when wife returned from Fresno, she was locked out of the house, needed a locksmith to gain entry, and could not find personal items she wanted to collect, including materials for an upcoming exam. The trial court said that, by pushing her way into the house when she was denied access, including calling the police twice, wife showed she "is a strong woman . . . , and not completely a wall flower here."

10

The trial court discussed the allegation that wife "was denied access to her family in the family home," finding "the house was dominated by [wife's] family for the better part of the year" and the court "ha[d] to take into account the fact that there was a great deal of access for a good period of time in the year 2020."

On January 16, 2021, wife and daughter returned to the family home. Prior to returning, the couple's attorneys helped them reach an agreement. The agreement was that husband and wife would live in the house "peacefully and civilly" while they pursued their divorce, wife "was to be shown the cameras and they were to be shut down," no family members were to live in the house, and husband and wife were to have equal access to their child. The trial court said the cameras were "a coercive type of activity" and "probably a little disconcerting." The trial court acknowledged, "The concern was, perhaps, that property was being taken out of the house," but said it did not believe husband's allegation that wife had taken $30,000 out of a wall safe because husband would not have given wife access to that amount of money. Wife did, however, remove "gold that had been given to her in this arranged marriage as part of the dowry," and the trial court inferred she did so because either she was planning to leave husband or she was concerned husband would take it.

Shortly after wife returned to the house on January 16, 2021, husband asked to take their daughter to the park and then denied wife access to their child "for a number of days." The trial court found this to be "the most critical feature of this case, and it [wa]s the reason why" the trial court granted the restraining order, explaining: "It was coercive in that under [section 6230, subdivision (d)] the child was taken and there was an attempt to bargain for a custody split 50/50. [¶] I will say some of that comment came from [husband's father], who called [wife] and said you won't get the child back unless there is an equal split in time, and we have a good lawyer, we have the money and resources to retain someone and you don't have the resources, and you'll be in trouble in that regard.

11

"She had a right to the child. She was drawn back into the house on an agreement that the parties would live civilly. Outside family members would not be involved. She agreed to that and immediately that agreement was broken. Coupled with that is the transfer of the house out from under the married couple." The trial court explained husband had purchased the home as a single, unmarried person, even though he was married to wife, and then transferred the house "to his father, who was the one who had put up the $70,000 or so . . . as a down payment on the house." The trial court noted husband transferred the home "out from under [wife] without any explanation, and later on there was an attempt to, or some mention of possibly evicting her from the marital home."

The trial court found husband's conduct constituted a "[b]ig breach of the agreement" to live "civilly and peacefully" and ruled: "In looking at the totality of everything that we learned, the Court learned in this case, physical abuse, the child abuse, to emotional and verbal abuse, to financial abuse, to coercion and control, the Court is satisfied by a preponderance of the evidence that a restraining order should issue, and the Court will so rule."

Wife requested that the trial court impose the restraining order for a three-year term; husband briefly argued three years was excessive. The trial court granted wife's request, explaining, "This wasn't particularly an easy case for the Court." The trial court imposed the three-year term because of "the history with [husband] making the comments that he has . . . taking into account what [wife's brother-in-law] and [wife's sister] had to say." Wife's counsel said she would prepare the proposed hearing order and the trial court thanked her.

The trial court signed the hearing order on June 18, 2021. Eleven days later, the trial court advised the parties that it was "entertain[ing] the reconsideration of the length of the restraining order" on its own motion and invited "briefing on this question."

12

At the July 27, 2021 hearing, the trial court explained it "didn't really give anyone an opportunity" to address the term of the hearing order and wanted to provide the parties with an opportunity to voice any concerns in that regard. The trial court further wanted to discuss "a second issue that kind of came up when the Court reviewed the order after hearing," i.e., the provision requiring husband to pay the mortgage for the duration of the hearing order despite wife having exclusive possession of the house. The trial court viewed the provision as "somewhat unusual."

Husband's counsel argued the three-year term was "totally outside the realm of reality" considering the court found "name calling" and "issues that the Court believed . . . were financial," but "the Court found no violence." Counsel explained, "Restraining orders with no violence should just get [the couple] to the place where these people can start working together," which husband and wife were doing. In husband's counsel's view, the restraining order had already achieved its purpose to calm the parties and "keep them separated," and thus the three-year term was excessive. Turning to the mortgage payment provision, husband's counsel said he just recently received a copy of the hearing order and he "never heard" the court impose that requirement, or he would have objected to it.

Wife's counsel challenged the trial court's authority to reconsider the hearing order on its own motion. After some back and forth regarding the trial court's authority, the trial court asked for argument regarding the duration of the restraining order and "the term that was injected into the order that [wife's counsel] prepared that indicated that [husband] would be on the hook for three years of the domestic violence restraining order for payment of the rent at a certain amount." The trial court said the mortgage payment provision "kind of startled [it] when [it] saw it," it had not "seen anything quite like that in a domestic violence restraining order ruling ever," and it found the provision unusual.

Wife's counsel looked at the hearing order and said: "So it doesn't say anywhere in -- oh, I see what you're saying about the payment using the bank mortgage, $2,500

13

continues paying the mortgage." She argued, despite the provision in the hearing order, the trial court still "ha[d] jurisdiction over property" and "the expectation was that once the restraining order was in place," the couple would resolve the property issues and the house would be sold or confirmed to one of the parties. Wife's counsel said wife "d[id] not have the intention of remaining in the family residence long term, but only for a period of time that it takes for [wife] to secure cooperation from [husband] and to reach a resolution in this case." Wife's counsel explained it was important for wife to remain in the home because husband was not cooperating in the divorce proceedings; was "continu[ing] to offset assets, [and] misappropriate assets and funds"; was refusing to pay child support to wife, "who [wa]s working full time and supporting [their] child on her own"; and was not cooperating with discovery.

The trial court expressed it did not "have a problem with [wife] being in the home while [everyone was] working through these things," but it did "have a problem with" requiring husband to pay the mortgage for "a three-year period, the duration of the domestic violence restraining order." Wife's counsel responded that she disagreed "the expectation of this restraining order is that [wife is] going to remain in the house for the next three years" and husband would be required to pay the mortgage for that term, because, in her view, "the parties [were] in the middle of the dissolution proceeding [and] the Court ha[d] the authority to . . . make orders regarding the assets at any time."

After giving husband's counsel an opportunity to respond, the trial court said it believed it had the authority to reconsider the terms of the hearing order. The trial court continued: "It surprises me that one would take the position that I don't have to serve the other side with something as fundamental as a final order, if that is what we're calling it at this point, particularly the argument that the Court cannot change a final order." The trial court said wife's counsel's argument that she did not have to serve the proposed order on husband's counsel because he attended the hearing did not "make any sense whatsoever."

14

The trial court ruled "on [its] own motion" to "reduce the time period of the restraining order from three years to two years." The trial court explained: "I do this because of the fact there -- I would disagree with [husband's counsel] in the sense that there -- what the Court was trying to say in its ruling is that there was not physical violence, but there was certainly emotional control and coercion and the comments and the steady drumbeat of the comments that were derogatory in nature from [husband] to [wife] certainly were significant in the Court's mind." The trial court noted it took into account that wife benefited from "the financial position of her husband and his family," such as "[t]he payment of her entire college degree and other opportunities," when it evaluated "all of the evidence and credibility of the parties." The trial court then clarified that it did not find physical violence had occurred, "except for the physical violence that occurred prior to the marriage," but it did find emotional abuse had occurred. "So I will shorten the period from three years to two years for that reason."

Turning to the mortgage payment provision, the trial court said: "I don't have a problem making a temporary order that [wife] is to remain in the house pending other details to be worked out regarding the divorce and the division of property. I think that's a fair thing, but the idea that a certain amount of money was incorporated in the domestic violence restraining order and for the period of time that she was to be living in the house and her rent being paid, I think that is the term that should not be there. [¶] But I would direct that temporarily [wife] is to have control of the house pending further orders of the Court and the Court would reserve further jurisdiction to make rulings of division of property."

After wife's counsel continued to argue that the trial court lacked jurisdiction to reconsider the hearing order, the trial court ordered the parties to brief the issue. The trial court ruled the hearing order would not be a final order until after the November 10, 2021 hearing for purposes of triggering the deadline to appeal the order.

During the November 10, 2021 hearing, the trial court reiterated it was unaware the mortgage payment provision was in the hearing order presented to it for signature and again expressed concern that the proposed hearing order was not provided to husband's counsel for review before it was submitted to the trial court. The trial court said it had forgotten the mortgage payment provision was part of wife's original restraining order request, it did not "see [a debt payment term] often" in restraining order cases, and it was concerned that the mortgage payment requirement could "continu[e] on somewhat indefinitely if there were to be a request for an extension of the restraining order" in the future. In the trial court's experience, "it is a very dicey issue" whether to affix a debt payment provision to a temporary restraining order without a hearing or to "keep those issues separate," especially in circumstances "as we have here," where there is ongoing litigation and continued "discovery of certain information." Considering the mortgage payment "certainly will be a [feature] of their divorce and their dissolution in terms of who owes what, who is allowed to be in the house, what's to happen to the house and whose [*sic*] to pay for what," the trial court said it seemed inappropriate and unfair to have the mortgage payment provision "affixed to a restraining order." The trial court expressed its belief that "a debt feature should not be affixed or part of the restraining order itself" and "should not be included for the time period or any extended time period."

Wife's counsel argued husband could file a motion and ask the court "to make another order" regarding the mortgage because "the Court has jurisdiction over the divorce proceedings for the entire duration." The trial court agreed husband could file a motion but said "the better thing is to not have it as a barnacle on the restraining order" because "of the consequences of the domestic violence restraining order having a financial hook in the middle of it." The trial court explained the mortgage payment provision may not be "something that is visible" to a judge when the restraining order is later renewed or extended.

Wife's counsel asserted there were, however, "very unusual issues still pending in this case" that "obviously caused prejudice to [her] client." She explained husband had transferred the home to his father, had placed other assets "out of reach," and was refusing to cooperate with discovery or pay child support. The trial court posited, "I guess the only question is, is whether or not all of that being said and I completely understand where you're coming from on that," whether the mortgage payment provision should "be a part of the restraining order." The trial court explained it was "having trouble with that."

Wife's counsel said her usual practice was to resolve issues like debt payments with opposing counsel and she understood "why the Court would be concerned about that issue." Wife's counsel, however, asserted she was unable to secure cooperation from husband's counsel in resolving "that issue." Wife's counsel further explained wife owed her "a lot of money" and was "just stuck in a place where there [wa]s no financial security for her."

Husband's counsel argued a three-year restraining order would mean wife could "live rent free for longer than the time she was married" and, because "[t]his was a property distribution dispute," it was better handled in family court through a "full blown hearing." Husband's counsel further argued husband was unemployed, wife was "making approximately $3,000 a month," and husband was caring for the child several hours a week. The duration of the hearing order was excessive in husband's counsel's view because the parties were "working fine together" and the trial court found "there was no physical violence."

The trial court asked: "Was there ever mention of -- by either side that among the terms of the restraining order would be one where father would be indebted to mom [for] $2,500 a month?" Husband's counsel responded, "No." The trial court said it seemed that the provision "was not discussed by anybody," "[n]o one argued that, either side, that debt payment should be part of the restraining order, and it was [an] omission on [the

17

court's] part." The trial court expressed the view that if it "abide[d] by [wife's counsel's] argument," the court "would be doing an injustice."

Wife's counsel replied: "Do I think it is fair that [husband] should have to pay a mortgage on a house for a period of three years, I never said that. What I said was, is that there is recourse in order to deal with it, which would require him to file a motion." The trial court asked whether "the better recourse" was to strike the provision from the hearing order because it was not the court's "intent to have a debt part of the restraining order." Wife's counsel responded in the negative, explaining she was concerned "that it again puts [her] client in a very precarious and prejudiced position" because husband continued "to violate court orders." Wife's counsel explained that, because the hearing order included the mortgage payment provision, she could file a motion to compel husband to perform. The trial court responded it would not overlook its concern simply because wife was "not getting the cooperation" she wanted from husband.

The trial court reiterated, as it explained "about six different ways," that it did not know the mortgage payment provision was in the hearing order and the parties "certainly didn't get [into] the question of debt" during the hearing. The trial court reduced the duration of the hearing order from three years to two years, explaining: "As I said last time, I think under the circumstances of this case, knowing that there was no physical violence I had trouble with coming to the conclusion I came to in this case. [¶] I granted it and, I think, I made myself clear at the time I did that this was a close call for the Court, and I think under the circumstances here, the Court was satisfied that [the] restraining order should issue, but the length of it of three years was in excess of what the Court deemed appropriate having heard all the facts in the case there were -- there was verbiage, there was coercion and control to be sure, but there was also, as I said, there was also some activities by [wife] that the Court was concerned about and I expressed that, and I believe a two year period will satisfy our purposes here, and I think it is the

18

right call and I standby it." The trial court further struck the mortgage payment provision because "that term in the middle of it" was "not appropriate in [its] view."

After wife's counsel asked the trial court to "put on the record the findings of the order being erroneous," the trial court invited wife's counsel to appeal the order, stating it "would say to [the appellate court], this should not be a part of a restraining order, and it is a way to circumvent the usual process whereby we'll decide through other channels of discovery who is to be paying what in terms of child support, who is to be paying spousal support, [and] how the property is to be divided."

Wife appeals.

## DISCUSSION

## I

### *The Trial Court Did Not Abuse Its Discretion*
### *When It Shortened The Duration Of The Hearing Order*

Wife argues "[t]he trial court's stated justification for shortening the [hearing order's duration] was not supported by substantial evidence" because the trial court "stated that its primary reason for adjusting the [hearing order's] duration was its belief that 'there was no[] physical violence,' " which "directly contradicted the trial court's original factual finding at the June 2021 hearing of several episodes of physical abuse."[4] In short, wife argues the "original findings were well supported by the record, and there was no substantial evidence to support the trial court's later decision to contradict them." We find no merit in wife's argument.

During the June 2021 hearing, the trial court detailed wife's testimony regarding the car incident prior to marriage. The trial court then discussed wife's brother-in-law's testimony that husband sometimes pushed, shoved, or struck wife; however, the trial

---

[4] Wife does not on appeal challenge the trial court's authority for reconsidering the terms of the hearing order.

19

court noted wife "never mentions anything about that" and "there was no mention of, that the Court could find[,] of physical abuse" during marriage. The trial court further noted that wife's sister also did not mention any physical abuse by husband against wife. The trial court ultimately said it would *not* issue the restraining order based on a finding of physical abuse, but it would weigh the evidence in tandem with the other evidence to determine whether, under the totality of the circumstances, the restraining order should issue. We do not read the trial court's statement that it was issuing the hearing order based on "the totality of everything" it "learned in this case, physical abuse, the child abuse, to emotional and verbal abuse, to financial abuse, to coercion and control" to mean the trial court found true all of the physical abuse allegations presented in the testimony during the hearing. That statement, upon which wife relies, does not support wife's assertion that the trial court found "several episodes of physical abuse" had occurred.

When the trial court originally imposed the three-year term in the hearing order, the trial court was explicit that it was imposing the three-year term based on the *evidence of emotional abuse*—i.e., the "comments" husband had made to wife, taking into account the testimony of wife's sister and wife's brother-in-law. The trial court reiterated its position in that regard during the July 2021 hearing, when it indicated its intent to reduce the hearing order's duration from three years to two years. The trial court explained it was "significant in the Court's mind" that there was "emotional control and coercion" and a "steady drumbeat" of derogatory comments from husband to wife. The trial court noted, however, that it also weighed the financial benefits wife had received during the marriage. The court clarified that, although it did not find physical violence had occurred, *except for* the car incident prior to the marriage, it did find emotional abuse had occurred and it would "shorten the period from three years to two years for that reason."

During the November 2021 hearing, the trial court referred back to what it "said last time" in terms of "knowing that there was no physical violence." Fairly read, the trial court thus referred back to its statement that it did not find that husband had

20

physically abused wife *during the marriage*, even though it did find credible wife's testimony as to the car incident prior to marriage. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1107 [an appellate court conducts a fair reading of the record]; *People v. Bolian* (2014) 231 Cal.App.4th 1415, 1422 [same].) The trial court accordingly did not contradict its June 2021 discussion of and findings regarding the physical abuse allegations, as wife asserts.

The trial court clearly explained that, when it originally imposed the three-year duration, it "was a close call" for the court and, although it "was satisfied that [a] restraining order should issue," it was reconsidering the duration of the order because the court believed "three years was in excess of what the Court deemed appropriate having heard *all the facts in this case*." (Italics added.) The court noted "there was coercion and control to be sure," but there were "also some activities by [wife] that the Court was concerned about," and it thus believed a two-year period would "satisfy our purposes here."

Based on the foregoing, we disagree with wife that the trial court's "primary reason" for adjusting the hearing order's duration was based on its finding no physical violence whatsoever occurred in this case. The trial court reconsidered the hearing order's duration in light of the evidence and its prior findings.

Wife makes no argument that the trial court's June 2021 findings were not supported by substantial evidence or that the trial court abused its discretion by not finding significant physical abuse had occurred. Indeed, wife asks us to reinstate the original hearing order that was based on the June 2021 findings. Because the trial court relied on its unchallenged prior findings when it reconsidered and reduced the term of the hearing order during the November 2021 hearing, we find no basis for reversing the trial court's ruling.

21

## II

*The Trial Court's Decision To Strike The Mortgage Payment Provision*

*Was Not Premised On Prejudicial Legal Error*

Wife argues the trial court prejudicially erred when it struck the mortgage payment provision from the hearing order because the trial court misunderstood the scope of its discretion under the Act.  Specifically, wife asserts the trial court believed it "had no power to include a mortgage payment term in a [restraining order]" and "expressed the blanket view that no 'financial hook' should appear in any [restraining order], and that these types of arrangements are instead properly resolved in divorce proceedings."  Wife further asserts the trial court's erroneous understanding of the scope of its discretion was prejudicial because "[t]he only reason the trial court amended the [hearing order] here to remove the mortgage payment term was its mistaken legal premise that such terms are not proper in a [restraining order]."  We conclude no prejudicial error occurred.

A trial court's ruling on a request for a restraining order is reviewed for an abuse of discretion.  (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 115.)  "All exercises of discretion must be guided by applicable legal principles, . . . which are derived from the statute under which discretion is conferred."  (*Farmers Ins. Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 106.)  "We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise."  (*Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 158.)

When we consider whether the trial court was influenced by an erroneous understanding of applicable law or was unaware of the full scope of its discretion, we must, as in any normal appellate review process, accept statements that support the trial court's ruling as representing the court's final determinations and interpret favorable to the ruling those statements which are susceptible to such interpretation.  (*People v. Risenhoover* (1968) 70 Cal.2d 39, 57.)  In other words, if the trial court said things that indicate it understood its proper role, and said things indicating it did not, the appellate

22

court is to focus on those statements that directly and by inference support the trial court's ruling. This notion has otherwise been described as "plac[ing] the most charitable interpretation possible" on the trial court's remarks so as to conclude that it used the proper standard. (*People v. Dickerson* (1969) 273 Cal.App.2d 645, 650; accord *People v. Browning* (1975) 45 Cal.App.3d 125, 137, overruled on other grounds in *People v. Williams* (1976) 16 Cal.3d 663, 669.) "[U]nless the record makes the assumption preposterous [citations] we must assume that the [trial court] applied correct legal principles to [its] rulings." (*Barajas v. Superior Court* (1970) 10 Cal.App.3d 185, 191, fn. 6.)

If an appellant makes an affirmative showing that the trial court's discretionary order was " ' "influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion," ' " the order may be reversed. (*In re Marriage of F.M. & M.M.*, *supra*, 65 Cal.App.5th at p. 116.) Even if the trial court erred in that regard, however, we will not reverse a discretionary order unless the appellant has demonstrated " 'it is reasonably probable that, but for the error, the appealing party would have obtained a more favorable outcome.' " (*In re S.G.* (2021) 71 Cal.App.5th 654, 673.) In other words, the appellant must show prejudice.

At the outset, we agree with wife that the trial court had discretion and was authorized to impose a debt payment provision, such as a mortgage payment requirement, in the restraining order after notice and a hearing.[5] (§§ 6324, 6340, subd. (a).) The Judicial Council of California's mandatory form, Restraining Order After Hearing (Order

---

[5] Section 6342.5, subdivision (a) (effective Jan. 1, 2021, and operative Jan. 1, 2022) also now expressly provides that, "After notice and a hearing, the court may issue an order determining the use, possession, and control of real or personal property of the parties during the period the order is in effect and the payment of any liens or encumbrances coming due during that period."

of Protection) (DV-130), indeed includes an option for the trial court to require the restrained party to make identified debt payments "until this order ends."

That said, wife has not affirmatively shown that the trial court misunderstood the applicable law or the scope of its discretion. The trial court never said it "had no power" to include a debt payment provision in the restraining order, nor did the trial court say "mortgage payments and other debt payment[] terms *cannot . . .* be part of a [restraining order]," as wife asserts. (Italics added.) We recognize and understand the trial court made several broad statements that it would be "inappropriate and unfair" to affix a mortgage payment provision to "a restraining order," it did not believe that such a provision should "be part of a restraining order," and that the imposition of such a provision "is a way to circumvent the usual process whereby we'll decide through other channels of discovery who is to be paying what in terms of child support, who is to be paying spousal support, [and] how the property is to be divided." The trial court's statements *as a whole*, however, reveal the trial court understood it *could* impose the mortgage payment provision in a restraining order but declined to do so in *this* case. (*People v. Cartier* (1960) 54 Cal.2d 300, 313 ["where a judge's statements as a whole disclose a correct concept of the law and its application, no secondary remarks should be deemed to have impeached his determination"]; *People v. Dickerson*, *supra*, 273 Cal.App.2d at p. 650 [where trial court's statements could be understood, though perhaps with some difficulty, not as announcing a general view but as a finding in a particular case, appellate court focused on the case-specific application].)

The trial court explained it was a "very dicey issue" as to whether a debt payment provision should be affixed to a restraining order, or whether it was more appropriate "to keep those issues separate," especially in circumstances, "as we have here," where there is ongoing litigation and continued "discovery of certain information." The trial court expressed concern (1) that the hearing order incorporated "a certain amount of money" to be paid for the duration of the hearing order while discovery was ongoing in the divorce

24

proceedings and (2) particularly because the mortgage payment issue *was not litigated* during the hearing that resulted in the issuance of the hearing order. The trial court thus expressed its view that if it "abide[d] by [wife's counsel's] argument" to retain the mortgage payment provision in the hearing order, the court "would be doing an injustice."

Wife's counsel said she "never said" she believed it was fair for husband to pay the mortgage for three years; she also said she did not expect wife to remain in the home "long term." Wife's counsel argued the reason wife needed the mortgage payment provision in the restraining order was to secure cooperation from husband in the divorce proceedings, because husband continued "to violate court orders," and the provision gave wife's counsel an opportunity to seek a motion to compel. The trial court in turn responded it would not overlook its concern simply because wife was "not getting the cooperation" she wanted from husband. In the trial court's view, the "better recourse" was to strike the mortgage payment provision from the hearing order and to consider any future motion wife may file on the merits with regard to the mortgage payment, given the trial court had continuing jurisdiction in the divorce proceedings. The trial court explained the mortgage payment "certainly will be a [feature] of their divorce and their dissolution in terms of who owes what, who is allowed to be in the house, what's to happen to the house and whose [*sic*] to pay for what . . . ." The trial court was thus willing to issue a "temporary order" for wife "to remain in the house pending other details to be worked out regarding the divorce and the division of property."

Read as a whole, the record shows the trial court struck the mortgage payment provision because (1) it was uncomfortable imposing the requirement for the duration of the restraining order given the parties' ongoing discovery and divorce disputes; (2) the mortgage payment provision was not litigated during the restraining order hearing; and (3) wife had other recourse (i.e., seeking a separate court order) to deal with the mortgage payment. The trial court's concern in that regard and its *preference* to deal with disputes

25

regarding the parties' home and associated mortgage payment outside the restraining order context do not affirmatively show that the trial court misunderstood the scope of its discretion or misapplied legal principles.

The trial court also did not misunderstand that it could modify or strike the mortgage payment provision in the hearing order in the future, as wife asserts. Indeed, the trial court acknowledged husband could file a motion to do so, but stated it believed the more appropriate course of action was to not have the mortgage payment provision in the hearing order in the first instance.

We further disagree with wife's assertion that she was prejudiced because "[t]he only reason the trial court amended the [hearing order] here to remove the mortgage payment term was its mistaken legal premise that such terms are not proper in a [restraining order]." In addition to the trial court's reasoning discussed *ante*, the trial court explained it did *not* exercise informed discretion when it imposed the mortgage payment provision in the June 2021 hearing order because it was unaware the provision was included in the proposed order submitted by wife. The trial court appropriately took issue with wife's position that she did not need to serve the proposed hearing order on husband following the June 2021 hearing. As in the trial court, wife's appellate counsel argues wife's trial counsel did not need to serve the hearing order on husband's counsel following the June 2021 hearing, citing sections 6380, subdivision (c) and 6384, subdivision (a). Not so.

Section 6380, subdivision (c), which pertains to the issuance of a restraining order, provides: "The information conveyed to the Department of Justice shall also indicate whether the respondent was present in court to be informed of the contents of the court order. The respondent's presence in court shall provide proof of service of notice of the terms of the protective order. The respondent's failure to appear shall also be included in the information provided to the Department of Justice." First, nothing in this code section provides that wife's counsel could submit a proposed order to the trial court for

26

signature without providing a copy to opposing counsel. Second, the statute applies only to the issuance of a protective order when the restrained party was "present in court to be informed *of the contents of the court order*." (§ 6380, subd. (c), italics added.) Here, the trial court did not *issue* the hearing order during the hearing, nor did it describe the contents of the hearing order, except for the three-year term. We note, although the minute order stated the hearing order would be "on the same terms and conditions as the Temporary Restraining Order," the trial court never made such an oral pronunciation during the June 2021 hearing.

Section 6384, subdivision (a) also does not assist wife. That statute provides: "If a respondent named in an order *issued under this part after a hearing* has not been served personally with the order but has received actual notice of the existence *and substance of the order through personal appearance in court* to hear the terms of the order from the court, no additional proof of service is required for enforcement of the order." (§ 6384, subd. (a), italics added.) The statute pertains only to enforcement of the order; it does not address whether wife's counsel could submit a proposed order to the court without providing a copy to opposing counsel.

Wife's counsel's transmission of the proposed hearing order to the trial court without providing a copy to husband's counsel constituted an ex parte communication. (See *Nguyen v. Superior Court* (2007) 150 Cal.App.4th 1006, 1013, fn. 2.) The prohibition against ex parte communication is " 'in essence, a rule of fairness meant to insure that all interested sides will be heard on an issue.' " (*Mathew Zaheri Corp. v. New Motor Vehicle Bd.* (1997) 55 Cal.App.4th 1305, 1317.) Moreover, California Rules of Court, rule 5.125(b) provides that, in cases under the Family Code (such as this), the party preparing a proposed order must, if the other party appeared at the hearing, serve the proposed order on the other party for approval before submitting it to the trial court. (See Cal. Rules of Court, rule 5.2(a), (c) [Family Rules apply "to every action and proceeding to which the Family Code applies"].) Wife did not do so here.

27

The parties never, during the June 2021 hearing, mentioned, discussed, or argued the merits of imposing the mortgage payment provision in the hearing order. Nor was there any mention of such a provision in the parties' written briefs. And, as the trial court explained repeatedly, it did not know the provision was in the proposed hearing order. If we were to reinstate the mortgage payment provision in the original June 2021 hearing order, as wife requests, we would be reinstating an order *not supported by the trial court's exercise of discretion*, as *expressly* explained by the trial court "about six different ways." That we will not do.

For the foregoing reasons, we find no reversible error in the court's modification of the hearing order to strike the mortgage payment provision.

DISPOSITION

The trial court's order is affirmed.


/s/_____
ROBIE, Acting P. J.


We concur:


/s/_____
MAURO, J.


/s/_____
BOULWARE EURIE, J.

28